[No. B234419. Second Dist., Div. Three. May 14, 2012.]

In re B.C., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
R.P., Defendant and Appellant.

COUNSEL

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Andrea Sheridan Ordin, County Counsel, James M. Owens, Assistant County Counsel, and Judith A. Luby, Principal Deputy County Counsel, for Plaintiff and Respondent.

OPINION

KLEIN, P. J.—R.P., the alleged father of B.C., appeals an order granting his request for paternity testing but requiring him to pay for the testing. We conclude that, because R.P. appeared in the dependency proceedings and filed a Statement Regarding Parentage Judicial Council form (JV-505) in which he requested a determination of biological paternity, the juvenile court was obliged to make that determination, whether by genetic testing or otherwise. (Welf. & Inst. Code, § 316.2; Cal. Rules of Court, rule 5.635.)[1] We therefore reverse the juvenile court's order and remand for a determination of biological paternity.

## FACTS AND PROCEDURAL BACKGROUND

### 1. Detention of B.C.

In July of 2009, the Los Angeles County Department of Children and Family Services (the Department) took eight-year-old B.C. into protective custody after his mother (mother) left him with a friend without making arrangements for the child's care. Mother identified R.P. as B.C.'s father but

---

[1] Subsequent unspecified statutory references are to the Welfare and Institutions Code; unspecified rule references are to the California Rules of Court.

said R.P. had never been a part of B.C.'s life and she had no information regarding R.P.'s whereabouts or date of birth.

At the detention hearing, the juvenile court ordered B.C. detained in foster care and declared R.P. his alleged father. Mother submitted a paternity questionnaire in which she stated she lived with R.P. at the time of B.C.'s conception but she did not know how to contact him.

A declaration of due diligence filed August 25, 2009, indicated the Department had been unable to locate R.P.

In the jurisdiction report filed August 25, 2009, mother's friend stated mother has indicated that B.C. was conceived as a result of a one-night stand.

On September 30, 2009, the juvenile court sustained the allegations of a dependency petition, declared B.C. a dependent child and ordered him placed in foster care.[2] The juvenile court ordered no family reunification services for R.P., "an alleged father only," under section 361.5, subdivision (b)(1).

> 2. *Mother fails to reunify; family reunification services are terminated.*

On April 1, 2010, the social worker reported mother was not complying with the case plan and she had been difficult to contact. The Department filed a declaration of due diligence dated March 30, 2010, detailing another unsuccessful search for R.P.

The Department reported that, on November 20, 2009, B.C. was placed with Mr. F., a middle school teacher who had an approved home study. Mr. F. was providing B.C. a stable home, was meeting his emotional, medical and physical needs on a consistent basis, and was interested in adopting B.C. if mother failed to reunify.

The Department later reported B.C. had been diagnosed with attention deficit hyperactivity disorder and Mr. F. was working with B.C.'s school to ensure he received appropriate services. Mr. F. has been courteous with mother, allows B.C. to receive daily telephone calls from mother and monitors her weekend visits. Mr. F. was interested in adopting B.C. but has indicated he is not sure he can continue to care for the child if mother's reunification services are extended. The Department asserted this would be detrimental to B.C. and recommended termination of reunification services.

---

[2] As sustained, the petition alleged mother left B.C. with an unrelated adult without making an appropriate plan for his care; mother and R.P. had failed to provide B.C. the necessities of life; and, R.P.'s whereabouts were unknown.

At the hearing, the juvenile court terminated mother's reunification services and scheduled a permanency planning hearing under section 366.26.

### 3. *Permanency planning.*

A social report filed for the permanency planning hearing indicated B.C. was participating in individual counseling and he enjoyed living with Mr. F. The report stated Mr. F. has a master's degree in education, he is motivated to give B.C. a permanent home and B.C. had shown significant progress in the care of Mr. F. The report recommended termination of parental rights and preadoptive placement with Mr. F.

### 4. *R.P. is located, appears and requests paternity testing.*

On January 11, 2011, the Department personally served R.P. with notice of the permanency planning hearing. R.P. appeared at the hearing on January 24, 2011. The juvenile court appointed counsel to represent him and continued the hearing to March 28, 2011.

On March 1, 2011, R.P. filed a written request for genetic testing to determine paternity of B.C. On March 8, 2011, the juvenile court concluded B.C. had a "right to know under these circumstances" and authorized testing but directed that R.P. would have to pay for it.

A social report filed for the continued permanency planning hearing indicated that on March 14, 2011, Mr. F. informed the social worker that B.C. wanted to keep open the possibility of being returned to mother and Mr. F. did not wish to interfere with that possibility. Although Mr. F. and B.C. no longer were interested in adoption, Mr. F. was willing to provide legal guardianship.

On March 24, 2011, R.P. filed a section 388 petition requesting, inter alia, a 60-day continuance of the permanency planning hearing for genetic testing. The juvenile court granted a hearing on the petition and continued the matter.

On May 12, 2011, R.P. filed a Statement Regarding Parentage (JV-505) in which he requested genetic testing to determine whether he is B.C.'s biological father. R.P. also submitted a declaration in which he stated he did not recall ever knowing mother but acknowledged the possibility he might be B.C.'s father. When R.P. learned of the dependency proceedings, he immediately came forward. R.P. asserted he desired to "meet his obligations to be a father to [B.C.] if I am indeed the boy's father."

At the hearing, B.C.'s counsel asked the juvenile court to deny R.P.'s petition, claiming an order granting the request would be "extremely disruptive" for B.C. The juvenile court found the requested order would not be in the child's best interests and refused to modify its earlier order.

R.P. filed a timely notice of appeal from the order of May 12, 2011.

5. *Subsequent developments.*

At the request of the Department we have taken judicial notice of a postpermanent plan review report filed September 26, 2011. This report indicates that, in June of 2011, Mr. F. asked the social worker to reinitiate the adoption process as Mr. F. and B.C. had discussed the matter further and now agreed adoption was the most appropriate plan for B.C. The report indicated B.C. no longer requires individual counseling, B.C. wants to be adopted by Mr. F., he is happy in the home and he calls Mr. F. "Dad."

## DISCUSSION

R.P. contends the juvenile court erred in failing to determine whether he is B.C.'s biological father. It appears this claim has merit.

■ Under section 316.2, at the detention hearing or as soon thereafter as is practicable, the juvenile court must inquire as to the identity of all presumed or alleged fathers.[3] (§ 316.2, subd. (a).) Rule 5.635 implements the provisions of section 316.2. (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1121 [53 Cal.Rptr.3d 437].) It provides that, if there has been *"no prior determination of parentage of the child, the juvenile court must take appropriate steps to make such a determination."* (Rule 5.635(e)(1), italics added.) Rule 5.635(e)(1) requires the man claiming biological paternity to file a Statement

---

[3] "In dependency proceedings, 'fathers' are divided into four categories—natural [or biological], presumed, alleged, and de facto. [Citation.]" (*In re A.A.* (2003) 114 Cal.App.4th 771, 779 [7 Cal.Rptr.3d 755].) A biological father is one whose paternity has been established, but who does not qualify as a presumed father. (*Ibid.*) An alleged father is a man who may be the father, but has not yet established himself as either a biological father or a presumed father. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15 [24 Cal.Rptr.2d 751, 862 P.2d 751].) A "de facto" parent refers to "someone such as a stepparent who has, on a day-to-day basis, assumed the role of a parent for a substantial period of time." (*In re A.A., supra,* 114 Cal.App.4th at p. 779.)

"Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801 [116 Cal.Rptr.2d 123].) "[O]nly a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services under section 361.5. [Citation.]" (*In re Zacharia D., supra,* 6 Cal.4th at p. 451.) However, a biological father may be offered reunification services if the juvenile court determines such services will benefit the child. (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 596 [110 Cal.Rptr.2d 679]; § 361.5, subd. (a).)

Regarding Parentage and rule 5.635(e)(2) permits the juvenile court to order genetic testing to make the paternity determination. Under rule 5.635(e)(3) the juvenile court may also make the paternity determination based on the "testimony, declarations, or statements of the alleged parents."

Rule 5.635(h) states: "If a person appears at a hearing in a dependency matter . . . and requests a judgment of parentage on form JV-505, *the court must determine*: [¶] (1) *Whether that person is the biological parent of the child*; and [¶] (2) Whether that person is the presumed parent of the child, if that finding is requested." (Rule 5.635(h), italics added.)

■ *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108 [45 Cal.Rptr.3d 198], considered the application of these provisions and concluded a juvenile court is required to determine biological paternity of a dependent child if such a determination is requested. "This is a mandatory, not a discretionary, rule." (*Id.* at p. 1118; see *In re Vincent M.* (2008) 161 Cal.App.4th 943, 959 [74 Cal.Rptr.3d 755]; *In re Paul H.* (2003) 111 Cal.App.4th 753, 760–762 [5 Cal.Rptr.3d 1].)

*In re Baby Boy V., supra*, 140 Cal.App.4th at page 1111, bears many similarities to the case at bench. There, the mother abandoned her child at the hospital. She did not give the hospital the father's name and refused to disclose the name of the father to the juvenile court. At the disposition hearing, the juvenile court placed the child in a prospective adoptive home in which a half sibling previously had been placed. Before the section 366.26 hearing, the father contacted the social worker and stated he had just learned he might be the child's father. (*In re Baby Boy V., supra*, at p. 1112.) He appeared at the section 366.26 hearing and requested paternity testing. (*In re Baby Boy V., supra*, at pp. 1112–1113.) The juvenile court denied the request because the child was in an adoptive home. (*Ibid.*) The juvenile court terminated parental rights, finding it was not in the best interests of the child to be removed from the prospective adoptive home. *In re Baby Boy V.* reversed and concluded rule 5.635 required the juvenile court to determine the child's biological father.

Similarly, *In re J.H.* (2011) 198 Cal.App.4th 635, 648 [130 Cal.Rptr.3d 389], concluded a finding that a man is a dependent child's presumed father did not relieve the juvenile court of its obligation to determine biological paternity where a JV-505 form requesting a judgment of parentage has been filed.

■ Here, R.P. filed a JV-505 statement, requested genetic testing to determine whether he is B.C.'s biological father and filed a declaration stating that, if he were found to be B.C.'s biological father, he wished to meet

his paternal obligations. The juvenile court authorized testing but required R.P. to pay for it and failed to make a determination of biological paternity. Under rule 5.635(h)(1), this was error.

The Department seeks to avoid this conclusion on various grounds. Primary among these is the Department's assertion a determination of biological paternity is irrelevant in this case because B.C., now 11 ½ years old, has had no relationship with R.P. and will soon be adopted by Mr. F., the only father he has ever known. Although Mr. F.'s resolve to adopt waivered in March of 2011, Mr. F. and B.C. have reconsidered and now wish to have the adoption procedure reinstated. Also, providing family reunification services to R.P. would jeopardize B.C.'s placement with Mr. F., who has been frustrated by the duration of mother's services. The Department concludes the juvenile court properly could conclude paternity testing was not in B.C.'s best interests, citing *In re Joshua R.* (2002) 104 Cal.App.4th 1020 [128 Cal.Rptr.2d 241].

In *Joshua R.*, the juvenile court denied an alleged father's request for paternity testing because it found he would not qualify as a presumed father even if he established biological paternity. (*In re Joshua R., supra*, 104 Cal.App.4th at p. 1025.) *Joshua R.* affirmed the juvenile court's ruling, noting the alleged father had no relationship with the child, had previously denied paternity, had never sought custody or visitation, and had waited until the child was five years old and involved in a third dependency proceeding before requesting a paternity test. (*Id.* at p. 1026.) Although a finding of biological paternity might result in the provision of family reunification services if the juvenile court found services would benefit the child (§ 361.5, subd. (a)), *Joshua R.* concluded the juvenile court had "implicitly rejected that option when it found paternity irrelevant and denied [the alleged father's] request for genetic tests. Underlying that decision is the implied finding the minor would not benefit from the provision of services to [the alleged father.]" (*In re Joshua R., supra*, at p. 1026.)

■    Initially, it appears *Joshua R.* assumed the only purpose served by a determination of biological paternity is the possibility the alleged biological father might thereafter advance to presumed father status. However, nothing in rule 5.635 limits the juvenile court's obligation to determine biological paternity to situations in which the alleged biological father might thereafter qualify as a presumed father.

Indeed, *In re Baby Boy V.* impliedly rejected such a limitation. The child in that case had been placed with his half sibling's caretakers and the caretakers wished to adopt both children. Although it appeared adoption would have been in the child's best interests had the alleged biological father not come

forward, *In re Baby Boy V.* concluded the possible biological father's interests in the child as well as the child's interests had to be considered. (*In re Baby Boy V., supra,* 140 Cal.App.4th at p. 1118.)

Additionally, other reasons warrant the rule requiring the juvenile court to determine biological paternity, including providing the dependent child access to the medical history of his or her family. Consequently, we disagree with *Joshua R.*'s conclusion the juvenile court's obligation to determine biological paternity turns on whether the man claiming paternity can demonstrate such a determination would benefit the child.

In any event, even applying *Joshua R.* to the facts of this case, biological paternity was not irrelevant. Two months before the permanency planning hearing, Mr. F. stated he and B.C. had decided not to seek adoption but legal guardianship. Thereafter, as indicated in the subsequent developments, they again decided to seek adoption.[4] Neither decision, in our view, renders the biological paternity determination irrelevant. Further, unlike the alleged father in *Joshua R.*, R.P. did not sleep on his rights but came forward as soon as he was made aware of the dependency proceedings and requested paternity testing. Moreover, R.P. was not seeking family reunification services or visitation as the Department appears to assert, merely a determination of biological paternity.

The Department also argues the juvenile court substantially complied with rule 5.635 by granting R.P.'s request for paternity testing. Thus, R.P.'s only argument is whether he should have been required to pay for the test. However, granting R.P. access to B.C. for the purpose of genetic testing did not fulfill the juvenile court's obligation to *determine* biological paternity and thus constituted a violation of rule 5.635(h)(1).

The Department also contends a section 388 abuse of discretion analysis should be applied to R.P.'s requests for paternity testing. (See *In re D.R.* (2011) 193 Cal.App.4th 1494, 1512 [122 Cal.Rptr.3d 753].) Although R.P. filed a section 388 petition in this case in order to seek modification of the juvenile court's order requiring him to pay for paternity testing, he also filed a Statement Regarding Parentage (JV-505) in which he requested a determination of biological paternity. As such, the issue presented is one of law, not discretion, which we review de novo. (*In re R.C.* (2011) 196 Cal.App.4th 741, 748 [126 Cal.Rptr.3d 418].)

---

[4] We acknowledge that postjudgment evidence of changed circumstances may not, except in extraordinary circumstances, be used as a basis to reverse on appeal the termination of parental rights. (*In re Zeth S.* (2003) 31 Cal.4th 396, 412–413 [2 Cal.Rptr.3d 683, 73 P.3d 541].) However, this appeal is not from an order terminating parental rights, we are not reversing the juvenile court's order based on the subsequent evidence and the evidence is necessary to a complete consideration of the Department's position.

In sum, the juvenile court should have acted on R.P.'s request to determine biological paternity. We therefore reverse the order of the juvenile court. Although on the facts presented genetic testing appears to be the only means by which to determine biological paternity, rule 5.635 allows for other types of evidence. We therefore decline to specify how the juvenile court should determine biological paternity in this case.

## DISPOSITION

The order of the juvenile court is reversed and the matter is remanded with directions to determine whether R.P. is B.C.'s biological father pursuant to rule 5.635.

Croskey, J., and Aldrich, J., concurred.