Filed 6/3/14  In re Athena Q. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re ATHENA Q., a Person Coming Under the Juvenile Court Law. | D064938 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J513950C) |
| v. | |
| MICHAEL S. et al., | |
| Defendants and Appellants. | |


APPEALS from a judgment of the Superior Court of San Diego County, Cynthia Bashant, Judge.  Affirmed.

Suzanne F. Evans, under appointment by the Court of Appeal, for Defendant and Appellant Michael S.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant Virginia P.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Virginia P. (Mother) and Michael S. appeal a judgment terminating their parental rights to Athena under Welfare and Institutions Code section 366.26.[1] Michael contends the judgment must be reversed because the court erred in entering judgment without first waiting for the results of a paternity test showing he is the biological father. Mother contends the court erred in failing to give her notice of her rights to challenge the order terminating reunification services and scheduling a section 366.26 hearing. We reject these contentions and affirm the judgment.

RELEVANT FACTUAL AND PROCEDURAL FACTS

Shortly after Athena was born in January 2013, the San Diego County Health and Human Services Agency (Agency) filed a petition alleging Athena was born with a positive drug test (amphetamines and opiates) and suffered withdrawal symptoms. The Agency also alleged Mother tested positive for amphetamine, admitted using drugs during pregnancy, and had no prenatal care. Mother reported a history of substance abuse that began at the age of 11 when she tried methamphetamine. Mother had three older children, none of whom were in her care. Each of the children had different fathers. Parental rights had been terminated for one of her children, and the other children were living with their fathers.

---

[1] All further statutory references are to the Welfare and Institutions Code.

Mother stated that Athena's father was Christian F., who was incarcerated, and there were no other possible fathers. Christian agreed he was the father and executed a voluntary declaration of paternity.

The juvenile court appointed counsel to represent Mother and Christian. The court found Christian was the child's presumed father and entered a presumed father order based on this finding. At a subsequent jurisdictional hearing, the court sustained the dependency petition.

On May 7, 2013, the court held a disposition hearing. At the hearing, the evidence showed Mother was not addressing the protective issues, continued to use drugs and struggle with addiction, and remained homeless. After the hearing, the court declared Athena a dependent, placed her in a foster home, denied reunification services, and scheduled a section 366.26 hearing to select and implement a permanent plan.

On that same date (May 7), Mother filed a notice of intent to file a writ petition challenging the order setting the section 366.26 hearing. Mother also filed a notice of appeal. The next day, this court dismissed the appeal because it was taken from a nonappealable order (the order setting the section 366.26 hearing). Soon after, Mother's counsel notified this court that the writ petition challenging the section 366.26 referral order "will not be filed as there are no viable issues for writ review." Based on that notification, we dismissed the writ matter on June 12, 2013.

The juvenile court scheduled the section 366.26 hearing date for September 3, 2013. In a report filed for the hearing, the social worker noted that Athena had been in the same foster home since she left the hospital after birth and she had developed a

strong, positive attachment to her caregivers. The social worker opined that she was likely to be adopted due to her young age, overall good health, sociability, personality, and developmental characteristics. The child's caregivers wanted to adopt her and had completed an adoptive home study. The caregivers were willing to maintain contact with the birth parents if the contact was in the child's best interests. The Agency had 86 other approved homes interested in adopting a child with Athena's characteristics. The social worker also opined that neither Mother nor Christian had a bond with the child that would preclude termination of parental rights. Christian had never visited with the child, and Mother's visitations had been sporadic.

At the September 3 hearing, the court continued the matter to September 30. A few days before the September 30 hearing, Mother alleged a new possible biological father—appellant Michael S., who was in custody. The court made arrangements for Michael to attend the September 30 hearing, and appointed counsel for him.

At the September 30 hearing, the court (retired Riverside County Superior Court Judge Jean Leonard) considered two matters.

First, the court heard Mother's section 388 motion seeking to renew reunification services and/or regain custody of Athena based on her claim that she was participating in a substance abuse treatment program. After considering the evidence presented, the court summarily denied the motion, finding Mother failed to meet her prima facie burden to

4

show changed circumstances and that a modification would be in the child's best interest.[2]

Second, the court heard Michael's motion seeking a paternity test and a continuance of the section 366.26 hearing pending the test results. In support of the motion, Michael completed a Parentage Inquiry form in which he said Mother told him he was the father when she was pregnant, but he took no actions regarding the child because he "never had the chance, wrote mom letters but never received response." Michael's counsel argued that Michael came forward promptly, explaining that Mother had told him that she "was going to get an abortion, and that was his understanding until recently when he found out about these proceedings."

Athena's counsel objected to a continuance, stating a continuance was not in the minor's best interest. Counsel emphasized that the child was doing very well with foster parents who want to adopt her and although it appeared Michael could possibly be the biological father, a father who has not obtained presumed father status has no standing at a section 366.26 hearing.

The Agency's counsel likewise objected to the continuance, noting that Michael has a lengthy prison sentence "[s]o there's no expected reunification"; there is already an existing presumed father (Christian); and a continuance would not be in the child's best interest. The Agency's counsel also asserted that "even if the court orders the paternity

---

2    Mother appealed from this order, and we affirmed the order in an unpublished opinion. (*In re Athena Q.* (Jan. 16, 2014, D064707).) Mother had also previously unsuccessfully appealed an order pertaining to the Indian Child Welfare Act. (*In re Athena Q.* (Dec. 23, 2013, D064265) [nonpub. opn.].)

test and he comes back . . . as the biological father," this fact will be irrelevant to the section 366.26 issues.

After considering these arguments, the court "reluctantly" continued the section 366.26 hearing to November 12, and granted Michael's request for a paternity test. The court said it appeared Michael "just found out that he might even have anything to do with this child in just the last few days." Michael's counsel stated that if Michael is the biological father, he "may be filing a [section] 388 to ask for placement with his biological relatives."

At the November 12 rescheduled section 366.26 hearing, Mother, Michael, and Christian appeared and each was represented by separate counsel. At the outset of the hearing, Mother orally presented another section 388 motion seeking to regain custody of Athena. The parties also informed the court that the paternity test results had not yet been received. Michael's counsel asked for a continuance until he obtains the test results. Counsel stated that Michael and the minor provided the necessary samples about one week ago, and that it is going to take "at least a few weeks to get those results." The court (San Diego County Superior Court Judge Cynthia Bashant) then engaged in the following colloquy with counsel:

> "The Court: Okay. Let me ask the Agency. I mean, [Michael] is currently . . . in custody. [¶] Is the Agency's recommendation likely to change if [Michael] is the biological father?"

> "[Agency's counsel]: No, Your Honor. In fact, the social worker received information this morning, and she could testify under oath, that the father [Michael] is serving a 26-year prison sentence. So, no, our recommendation would absolutely not change, and I could put her on the stand to testify to that."

6

"[Michael's counsel]: Your Honor, if the father is the biological father, he will be filing a 388 for visitation and to have his relatives assessed for placement."

"The Court: You know, at this point I don't know that it would change the recommendation on the .26. I really don't. . . . I think at this point what I'd like to do is if you have anything you want to present on that issue . . . on your request for placement with the relatives, you can certainly put that on. But I'm not sure that changes very much."

[¶] . . . [¶]

"[Minor's Counsel]: My position would be that if [Michael] were to be found biological, he would still need to file a 388 asserting changed circumstances and a showing of best interest to remove Athena from her current placement and placed with his relatives. [¶] At this point I think— if we were to take evidence, I think the evidence would show that Athena has been with her current caretakers almost her entire life, and there is no sign that she needs another placement."

"The Court: I'm not inclined to grant the continuance request at this point, . . . . I'm not sure it makes a whole lot of difference other than letting [Michael] know what his situation is and letting Athena know who the biological father is."

The court then conducted a combined section 388 and section 366.26 hearing, during which Mother presented evidence regarding her visitations and bond with Athena and her recent progress in a drug recovery program. With respect to Michael, the social worker testified that the delay in the paternity test was not Michael's fault and was instead the result of communication problems between the entity that conducts the test and the laboratory testing facility. The social worker also testified that Michael's current sentence is "24 years or 26 years." Michael's counsel confirmed at the hearing that Michael would not be asking for reunification services even if he was the biological father.

7

During closing arguments, Michael's counsel renewed his request for a continuance "to receive the results of the DNA test." Michael's counsel stated: "We've already continued this matter for a few weeks to receive those results. It seems that it makes more sense now to actually receive those results and have that information before the court rules on the .26 hearing."

The court responded to this argument as follows:

> "First of all, when the paternity test results are received, I will order that copies be provided to all counsel and provided to [Michael] as well so that he knows one way or another.

> "At this point my understanding is the only thing he's really asking for, if he's the biological father, is that his relatives be available. He's not in a position to care for Athena, not even now, but at any point during her minority. The next 18 years of her life, he's not available to care for her, so the only thing that would be available to him at this point is a request that his relatives be available.

> "And if for any reason the current caretakers are not available, I think that is appropriate. If for some reason the current caretakers fell through and he has other caretakers that he wanted to be available and he is the father, then I would suggest that the social worker find out from him if there are any backup people who would be willing to take placement of Athena, then if something were to fall through, I think that would be appropriate.

> "But at this point, I don't see what a continuance would get, even if he was the biological father. And I'm assuming today that the biological results came back. I don't know what we would do, short of doing exactly what I'm doing right now, which is saying we have possible relative caretakers as backups in case the current foster homes fall through. [¶] I [agree with the minor's counsel that] at this point [there is no reason to remove] the child from a home that has been raising the child since birth."

The court then denied Mother's section 388 motion, and found the Agency proved its claims on the section 366.26 petition. On the section 366.26 issues, the court noted

8

that Athena is "clearly adoptable," including by her current caretakers and the 86 other families who would adopt a child like her, and that "if [Michael] is the father, he may have people who want to adopt her." The court found by clear and convincing evidence: (1) it is likely Athena will be adopted if parental rights are terminated; (2) none of the circumstances listed in section 366.26, subdivision (c)(1)(B) exist in the case; and (3) adoption is in Athena's best interests. At the conclusion of the hearing, the court ordered the termination of Mother's and Christian's parental rights. The court also stated: "I'll also terminate the rights of [Michael], who may or may not be the biological father of the child, but I'll order that any paternity test results be provided to [Michael] so he knows one way or the other where we stand, and I will set this for post-permanency planning."

In response, Michael asked the court, "why did you waste my time and everybody else's time by even taking a test or ordering a test when you didn't even care what the results were going to be?" The court replied: "Because, as I said before, I do think it can be very helpful. I think it can be very helpful for Athena to know who her biological father is, and I think it can be very helpful if you have relatives who are available and might be willing to take Athena. I think that can be very helpful for Athena as well."

After the section 366.26 hearing, the Agency received genetic test results indicating that Michael was Athena's biological father.

DISCUSSION

MICHAEL'S APPEAL

Michael contends the judgment terminating parental rights must be reversed because the court erred in entering judgment without first waiting for the results of a paternity test showing he is the biological father.

### I. *Applicable Law Regarding Presumed and Biological Fathers*

There are three types of fathers in juvenile dependency law: presumed, biological, and alleged. (*In re Kobe A*. (2007) 146 Cal.App.4th 1113, 1120.) A presumed father is a man who meets one or more specified statutory criteria pertaining to facts showing a cognizable relationship between the man and the mother/child. (Fam. Code, § 7611.) A biological father is a man whose paternity has been established, but who has not shown he is the child's presumed father. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15 (*Zacharia*).) An alleged father is a man who has not established biological paternity or presumed father status. (*Ibid.*) These categories are meant "to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not." (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 708.)

"Presumed father status ranks highest." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801.) "[T]he term 'presumed father' is . . . a term of convenience used to identify a preferred class of fathers by reference to the familial bonds described in [Family Code] section 7611 which the Legislature has determined reasonably approximates the class of fathers it wishes to benefit." (*Id.* at p. 805.) Generally, only a statutorily presumed father is entitled to reunification services. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209; *In re*

10

*Joshua R.* (2002) 104 Cal.App.4th 1020, 1025.) " '[P]arental rights are generally conferred on a man not merely based on biology but on the father's connection to the mother [and/or] child through marriage . . . or his commitment to the child.' " (*Zacharia, supra*, 6 Cal.4th at p. 449.) "Case law holds that mere *biological* fatherhood, unaccompanied by a parent-child *relationship*, is worth little in the dependency context." (*In re Joshua R., supra*, 104 Cal.App.4th at p. 1029; see also *In re Christopher M*. (2003) 113 Cal.App.4th 155, 160.)

"For a biological father who does not assert paternity until after the expiration of any reunification period, the 'only remedy' is to file a petition to modify under section 388. [Citation.] 'While a biological father is not entitled to custody . . . or reunification services . . . if he does not attain presumed father status prior to the termination of any reunification period, he may move under section 388 for a hearing to reconsider the juvenile court's earlier rulings based on new evidence or changed circumstances.' [Citation.] The section 388 petition will not be granted unless there are changed circumstances or new evidence demonstrating it is in the child's best interest to grant reunification services or custody." (*In re Vincent M*. (2008) 161 Cal.App.4th 943, 955, fns. omitted (*Vincent M*.).)

## II. *Analysis*

The parties vigorously debate the issue regarding the circumstances under which a court *must* order paternity testing to allow an alleged father to be considered a biological father. Michael says that under section 316.2 and California Rules of Court, rule 5.635, a court has a *mandatory* duty to order a paternity test, while the Agency says that a test

11

must be ordered only if the parent fills out a particular judicial council form (Form JV-505) and only if there is no other determination of the child's parentage. (See Cal. Rules of Court, rule 5.635(e), (h).) However, we need not resolve these particular arguments because the court (over the Agency's and the minor's counsel's objections) *did* order Michael to be tested and did initially continue the hearing. The issue before us is whether on the particular facts of this case the court erred in refusing to again continue the section 366.26 hearing to learn the results of the test before terminating the parents' rights.

In considering this issue, we agree with Michael that in a perfect world it would have been better for the court to postpone the hearing until the paternity test results were received several weeks later. A postponement for a few weeks would have avoided this appellate issue and possibly have provided the parties with more psychological satisfaction in understanding the precise biological relationships before parental rights were terminated.

But we also agree with the Agency that Michael was not entitled to a continuance as a matter of right; there was no abuse of discretion; and any error in failing to continue the hearing and obtain the results before terminating Michael's alleged rights was not prejudicial.

"Section 352 provides that a continuance shall be granted only on a showing of good cause and shall not be granted if it is contrary to the minor's best interests." (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 810 (*Ninfa*).) " '[T]he court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged

12

temporary placements.' (§ 352, subd. (a).) Continuances are discouraged [citation] and we reverse an order denying a continuance only on a showing of an abuse of discretion [citation]." (*Id.* at pp. 810-811.)

Michael did not show good cause for a continuance. The paternity information was not relevant at the section 366.26 hearing and would not have affected its outcome. At this stage of the dependency process, the "focus of the law shifts from reunification to the child's interest in a stable and permanent placement" (*In re Xavier G.* (2007) 157 Cal.App.4th 208, 214), and the sole issue " 'is whether there is clear and convincing evidence that the child is adoptable.' [Citations.]" (*In re Josue G.* (2003) 106 Cal.App.4th 725, 733; see § 366.26, subd. (c).) If the court finds a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds that termination of parental rights would be detrimental to the child under one of the statutory exceptions. (See *In re Jamie R.* (2001) 90 Cal.App.4th 766, 773; § 366.26, subd. (c)(1)(A), (B)(i)-(v).)

In *Ninfa, supra*, 62 Cal.App.4th 808, this court affirmed an order denying an alleged father's request for a continuance of the section 366.26 hearing to attempt to establish paternity. We reasoned: "The only basis of the requested continuance was [the alleged father's] wish to establish his genetic link to Ninfa. However, [the alleged father] does not explain how this information would have been relevant to any issue decided at the .26 hearing. A .26 hearing is concerned only with a long-term placement plan for the child, the preferred alternative being adoption and termination of parental rights. The court first decides whether it is likely the child will be adopted if parental rights are

13

terminated. If so, the court examines whether termination of parental rights will be detrimental to the minor based on four enumerated circumstances. '[T]here is no window of evidentiary opportunity for a parent to show that in some general way the "interests" of the child will be fostered by an order based on some consideration not set forth in section 366.26.' [Citation.] [¶] Here, genetics is irrelevant to either the likelihood of Ninfa's adoption or any of the four enumerated exceptions which might make termination of parental rights detrimental to Ninfa. Because further delay of the hearing would have interfered with Ninfa's need for prompt resolution of her custody status and her right to a permanent placement, and the sole reason asserted for continuing the hearing was to adduce information irrelevant to the pending proceeding, the court did not abuse its discretion by denying the continuance." (*Ninfa, supra*, 62 Cal.App.4th at p. 811.)

Similarly, the fact that Michael may have been Athena's biological parent was not relevant to any of the issues to be resolved at the section 366.26 hearing. Michael argues that if he was identified as the biological father, he would have had the opportunity to present the names of relatives who may be available for placement. However, the court stated that it would assume Michael was the biological parent and Michael could present any evidence regarding relative placement at the hearing. Michael made no attempt to do so. This is understandable because the undisputed evidence showed Athena had been placed in a stable home and she was thriving in this home. The only basis for removing her from this home at the time of the section 366.26 hearing was a section 388 motion showing new facts *and* that a change in placement was in the child's best interests. Michael does not argue he could have prevailed on such a section 388 motion even if he

14

was the biological father. Moreover, with respect to adoption, "[i]t is well established that [the statutory] relative placement preference . . . does not apply after parental rights have been terminated and the child has been freed for adoption." (*Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1031; see *In re Sarah S.* (1996) 43 Cal.App.4th 274, 285.) The only exception is that an *existing* relative caretaker shall be given preference in applying to adopt the child once the parental rights are terminated. (§ 366.26, subd. (k).) This exception was inapplicable here.

Although the court made statements that Michael's relatives could be considered in the adoption process if the test results showed he was a biological parent, viewed in context, the court was not suggesting that his relatives had a *legal right* to be adoptive parents. Instead, the court properly stated that Michael's identity as Athena's biological father could be helpful to Athena when she was older and the Agency would have the discretion to consider his relatives in the adoption process if that was in Athena's best interests.

Michael alternatively contends he was prejudiced by the court's failure to consider the paternity test before terminating his alleged rights because he "should [have] be[en] able to present a section 388 petition seeking to elevate his status" to a presumed father. However, Michael never sought to be declared a presumed father in the proceedings below, and the court had already entered an order finding another man was the presumed father (Christian). Michael specifically stated he was not seeking reunification and did not state or suggest he wanted to challenge Christian's status as presumed father or to become a presumed father. "As a general rule, a party is precluded from urging on

15

appeal any point not raised in the trial court." (*In re Riva M.* (1991) 235 Cal.App.3d 403, 411-412.) "Any other rule ' " 'would permit a party to play fast and loose with the administration of justice . . . .' " [Citation.]' " (*Id.* at p. 412.)

Michael additionally contends he had a constitutional right to establish his genetic link to Athena and thus a continuance of the section 366.26 hearing was legally required. In support, Michael relies on *In re Baby Boy V.* (2006) 140 Cal.App.4th 1108 (*Baby Boy*) and *In re B.C.* (2012) 205 Cal.App.4th 1306 (*B.C.*). These cases do not support Michael's contention.

In *Baby Boy*, Jesus H. contacted the social services agency as soon as he learned the mother (with whom he had a prior relationship) had a baby. (140 Cal.App.4th at pp. 1111-1112.) A section 366.26 hearing had already been scheduled. He told a social worker he wanted reunification services. (*Id.* at p. 1112.) The social worker did not inform the court that the baby's apparent father had come forward. (*Ibid.*) Jesus then appeared at the section 366.26 hearing, but the court refused to order a paternity test, finding Jesus's request and objections were untimely. (*Id.* at pp. 1112-1115.) The juvenile court found it was not in the child's best interests to be removed from his existing caretakers, and terminated parental rights. (*Ibid.*) The reviewing court reversed the order terminating parental rights. (*Id.* at p. 1119.) The court explained "it is undisputed that Jesus, a nonoffending, stable, employed, and financially responsible adult, came forward at the earliest possible moment and when the baby had been in foster care for only eight months. . . . [¶] *When an unwed father learns of a pregnancy and 'promptly comes forward and demonstrates a full commitment to his parental*

16

*responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent.*  Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship." (*Id.* at p. 1117, italics added.)  The court found that because Jesus came "forward and attempt[ed] to do the right thing by offering to provide emotional and financial support and a home for the child he believes is his, Jesus's interests must also be considered, not just the child's interests." (*Id.* at p. 1118.)  The court ordered that on remand the court must "*immediately*" order a paternity test, and if Jesus is found to be the biological and fit father, the court must provide him with reunification services and "consider anew all issues about the appropriate permanent plan" for the child. (*Id.* at p. 1119.)

*Baby Boy*'s expansive holding has been questioned. (See *Vincent M., supra*, 161 Cal.App.4th at p. 959.)  But even assuming its legal validity, the facts here are materially different.  As did Jesus, Michael came forward promptly.  But unlike Jesus, Michael was not seeking to reunify and was not prepared to support the child or have any type of caretaking role with the child (nor could he because he would be in custody for at least 24 years).  And the court had already entered an order finding another man was the presumed father.  On these facts, Michael was not similarly situated to Jesus and had no statutory or constitutional right to establish a biological parental relationship before the section 366.26 hearing.  As the California Supreme Court has stated, the mere biological connection between a father and a child is not subject to constitutional protection unless "the father grasps the opportunity to develop that biological connection into a full, and

17

enduring relationship." (*Adoption of Kelsey S*. (1992) 1 Cal.4th 816, 838.) Michael made no attempt to "grasp[ ]" an opportunity to create a relationship with this child. Accordingly, at the section 366.26 hearing, the court properly focused solely on Athena's best interests and her need for permanency.

*B.C.* likewise does not support Michael's arguments. There, the alleged father challenged only the court's refusal to order the social services agency to pay for the paternity testing, and the reviewing court made clear "this appeal is not from an order terminating parental rights." (*B.C., supra*, 205 Cal.App.4th at p. 1314, fn. 4.) Additionally, in *B.C.* , unlike here, the alleged father stated "he wished to meet his paternal obligations" if he were found to be the biological father. (*Id.* at pp. 1312-1313.) Michael relies on a portion of *B.C.* in which the court stated the purpose of a paternity test is not only to determine whether an alleged biological father might qualify as a presumed father, but it is also relevant to "provid[e] the dependent child access to the medical history of his or her family." (*Id.* at p. 1314.) These observations are consistent with our conclusions. The court here ordered the test and stated that despite the parental termination order, the result should be disclosed to Michael and other interested parties because it might be of help to Athena as she grows up. However, nothing in *B.C.* suggests a court cannot terminate parental rights before receiving the results of the paternity test in a situation where, as here, the father has not come forward to accept or seek a parental relationship with his alleged biological child.

18

MOTHER'S APPEAL

Although Mother filed an appeal from the section 366.26 judgment, she does not raise any challenge to the court's section 366.26 findings that Athena is adoptable and no statutory exceptions apply. Instead, Mother's sole appellate contention is that she was not provided adequate notice of her right to bring a writ petition to challenge the court's May 7 order setting the section 366.26 hearing, and thus she is entitled to assert these contentions on appeal from the section 366.26 judgment.

The argument is factually unsupported. The court did orally advise Mother of the need to bring a timely challenge to the section 366.26 referral order. Additionally, even assuming any technical deficiencies in this notice, the record shows Mother had actual notice of the need to file a writ, because she *did in fact timely file with this court a notice of intent to file a writ petition challenging the court's May 7 referral order*. Several weeks later, her attorney notified this court that Mother would not be filing this petition "as there are no viable issues for writ review." We thereafter dismissed the writ matter.

On this record, we reject Mother's argument that she was denied the opportunity to challenge the May 7 referral order by a writ petition. Not only was Mother provided the opportunity to file a writ petition, she *did* file a notice of intent to file the petition.[3] Further, we have reviewed her untimely appellate challenges to the May 7 referral order

---

[3] Mother's appellate contention borders on being frivolous. The same can be said of Mother's prior appeal challenging the order denying her earlier section 388 motion. Mother's current counsel represented her in both appeals. We remind counsel of the obligation to review the law and facts before filing an appeal.

19

and find they are without merit.  Substantial evidence supported the court's denial of reunification services to Mother.  (See § 361.5, subd. (b)(10), (11).)

DISPOSITION

Judgment affirmed.


HALLER, J.

WE CONCUR:


HUFFMAN, Acting P.J.


IRION, J.

20