Filed 9/22/14  S.L. v. Superior Court CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| S.L. et al., | 2d Civil No. B256801 |
| | (Super. Ct. No. JV42903) |
|    Petitioners, | (San Luis Obispo County) |
| | |
| v. | |
| | |
| SAN LUIS OBISPO COUNTY SUPERIOR COURT, | |
| | |
|    Respondent; | |
| | |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| | |
|    Real Party in Interest. | |

      S. L. (Mother) and J. S. (Father) file petitions for extraordinary writs (Cal. Rules of Court, rules 8.452, 8.456) to review orders of the juvenile court bypassing their request for family reunification services with their child K. L., a person coming under the juvenile court law.  (Welf. & Inst. Code, §§ 300, subd. (b), 361.5, subd. (b).)[1]  We conclude, among other things:  1) the trial court did not err by denying family reunification services because Father did not establish a presumed father status, and 2) it did not err by bypassing family reunification services for Mother because of her history

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise stated.

of drug abuse and resistance to treatment. (§ 361.5, subd. (b)(13).) The petitions are denied.

## FACTS

On January 7, 2014, the San Luis Obispo County Department of Social Services (DSS) filed a juvenile dependency petition (§ 300, subd. (b)) alleging Mother failed to protect K. L., a two-year-old girl, from abuse and neglect. On January 3, Mother was arrested for using and being under the influence of a controlled substance, methamphetamine, and "willful cruelty" to a child. The little girl was dirty and hungry. She was in a car outside a fast food restaurant and had a large bruise on her forehead. Mother was asleep in the car. When law enforcement arrived, Mother "was fidgeting" and "appeared confused." DSS placed the child into protective custody because of Mother's "chronic substance abuse problem."

On January 8, 2014, the trial court ruled that K. L. "is a person described by Section[] 300 . . . (b) [and] (g)" and that "detention of the minor[] is required." It authorized visits by the child to see Mother at the county jail.

In its revised findings and orders after dispositional hearing, the trial court found: 1) K. L.'s "out-of-home placement is necessary," 2) the "current placement is appropriate," 3) Father is the biological father of K. L., and 4) contact and visitation between Father and K. L. is "not in [the] minor's best interest."

Father was convicted of robbery in 2011. He was released from state prison on March 14, 2014. On March 27, he took a paternity test that proved he was K. L.'s biological father.

DSS recommended that Father not receive family reunification services because: 1) he had "a violent criminal history," 2) he "never had a relationship with [K. L.]," and 3) K. L.'s "reunification with him would not be in her best interest." DSS determined Father had not promptly taken the necessary steps to qualify as a "presumed father," and consequently he was not entitled to reunification services.

2

At the May 21, 2014, contested hearing, Melissa De Poorter, a DSS social worker, testified Father had known for two years that he "could be the biological father," but he "never" established "a relationship with" the child.

Father testified he had not taken steps to establish paternal rights until after he was released from prison because, when Mother was pregnant, she told him he was not K. L.'s father and he believed her. Father said, before entering prison, Mother's brother told him that Mother gave K. L. the same first name as his (Father's) step-daughter. Father testified he regarded this statement to be a "joke" and a "vulgar" remark. He felt he did not need to take steps to determine if he was the biological father at that time. Responding to a question by the court, he said he thought he "might be the father" when he was in prison. He also felt "the odds were against it." He had a "short term" relationship with Mother. They had sexual relations on two occasions. He said predicting whether he was the father was "kind of a gamble" and "[he] lost."

DSS recommended Mother be bypassed from receiving reunification services because of her chronic drug abuse problem and her resistance to treatment.

Mother testified that using "meth" was part of her "lifestyle" from 1999 until August 2010. The next time she used methamphetamine was in November 2013. She was arrested for "being under the influence" when she was pregnant with K. L. Her parental rights to another child were previously terminated because of her drug abuse problem. Mother said she told Father that K. L. was not his child when she was pregnant. She said T. L., her "ex-boyfriend," was the father. She said she "never saw or spoke to [Father] again until the day he showed up in court" after he was released from prison.

De Poorter testified Mother had received various drug rehabilitation treatment services. But after completing those programs, "[Mother] has relapsed each time."

The trial court denied reunification services for Mother and Father finding it would not be in the child's best interests. It rejected Father's claim that he achieved a presumed father status. It found the DSS assessment to bypass Mother from receiving

3

reunification services because of her chronic drug abuse addiction was proper. (§ 361.5, subd. (b)(13).)

## DISCUSSION

### *Presumed Father Status*

Father contends the trial court erred in denying his request for family reunification services. He claims the evidence does not support the court's finding that he failed to show a presumed father status. We disagree.

Father relies heavily on his testimony and Mother's testimony to challenge the trial court's order. But the issue is not whether he claims some evidence supports his position, it is only whether substantial evidence supports the findings. (*In re Brandon T.* (2008) 164 Cal.App.4th 1400, 1408; *In re Josue G.* (2003) 106 Cal.App.4th 725, 732.) We must draw all reasonable inferences in support of the court's orders. (*Josue G.*, at p. 732.) We do not weigh the evidence or resolve evidentiary conflicts.

"A biological father is one whose paternity has been established, but who does not qualify as a presumed father." (*In re B.C.* (2012) 205 Cal.App.4th 1306, 1311, fn. 3.) "Only a 'presumed' father . . . is entitled to reunification services." (*In re Julia U.* (1998) 64 Cal.App.4th 532, 540.) A biological father may become a "presumed" father by showing he promptly assumed parental responsibility for the child. "If an unwed, biological father promptly comes forward and demonstrates a full commitment to his parental responsibilities, his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Id.* at pp. 540-541.) "We consider his conduct before and after the child's birth, including whether he publicly acknowledged paternity, paid pregnancy and birth expenses commensurate with his ability to do so, and promptly took legal action to obtain custody of the child." (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 583.)

An unwed biological father seeking presumed father status must take parental responsibility within "a short time" after he knew or should have known of the pregnancy. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1060; *In re Elijah V.*, *supra*, 127 Cal.App.4th at p. 583.) If paternity is not established and he believes he

4

might be the father, he must take steps to resolve that issue and "seek to have his name placed on [the child's] birth certificate." (*In re J.H.* (2011) 198 Cal.App.4th 635, 646.) He must show he "'has *promptly taken every available avenue* to demonstrate that he is willing and able to enter into the fullest possible relationship with [his child] . . . even if he has not as yet actually been able to form that relationship.'" (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 838-839, italics added.) He should promptly request a paternity test "despite the uncertainty [about whether] he was the father." (*Adoption of A.S.* (2012) 212 Cal.App.4th 188, 212.) An indifferent or "laissez faire attitude" about parental obligations is inconsistent with presumed father status. (*Ibid.*) A biological father has the burden "to establish the factual predicate" to establish presumed father status. (*Id.* at p. 209.)

Here the trial court found: 1) Father knew Mother was pregnant at a "time consistent with" his sexual relationship with her, 2) but Father "did nothing to further identify whether or not he had a biological relationship to" this child, 3) Father admitted that while in prison he was aware of "the possibility of his parentage, and he elected to do nothing at that time," and 4) Father did not make efforts to "elevate his status to more than a mere biological father."

At the May 21, 2014, hearing, De Poorter testified that Father "was made aware he could be the biological" father "approximately two years ago . . . ." But Father "never" established "a relationship with" the child.

Father decided to take a paternity test only after he was released from prison. Before entering prison, Father had the Mother's phone number. But during his two years in prison, he did not request to take a paternity test or to have his name placed on the birth certificate. (*In re J.H.*, *supra*, 198 Cal.App.4th at p. 646.) He did not publically acknowledge paternity. He never called Mother to find out about the pregnancy, those expenses, the child or his parental responsibilities.

Father notes that he testified he was justified in not making those inquiries or taking action because Mother told him he was not the father and he believed her. He suggests the trial court was required to accept this testimony. But as trier of fact, the

5

court "could reject appellant's testimony either in whole or in part." (*Bazaure v. Richman* (1959) 169 Cal.App.2d 218, 221.) It "'may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.'" (*Ibid*.) The credibility of witnesses "is the exclusive province of the trial judge." (*In re E.L.B.* (1985) 172 Cal.App.3d 780, 788.)

DSS claims: 1) evidence supports reasonable inferences that Father believed he could be the biological father, but he elected not to promptly assume parental responsibility, and 2) the trial court could find Father's testimony was impeached. We agree. Father admitted he knew Mother was pregnant. Her pregnancy fell within the timeline consistent with their sexual relations. The court could find this impeached the credibility of Father's and Mother's testimony that while pregnant Mother had the ability to know that Father was not K. L.'s biological father. A DSS addendum report reflects that before the paternity testing results, Mother told a DSS social worker that she did "not currently know who [K.L's] father might be." The court could reasonably infer she could not have known paternity without a DNA test, and any reasonable presumed father would know this and promptly request such a test. But Father did not make such a request or indicate any desire to take one until after he was released from prison.

Moreover, Father testified that while in prison he "thought [he] might be the father" of the child. He said two years earlier, before he went to prison, Mother's brother told him, "'[Mother] named *your daughter* [K.], so now you will never forget *your daughter*.'" (Italics added.) Father admitted that after hearing this information he made no effort to determine whether he was the biological father. He claimed he felt the brother's remarks were a joke, but the trial court did not accept that part of his testimony.

Father testified Mother did not tell him about naming the child. But a DSS report reflects that he told the DSS social worker that "[Mother] had previously advised him that she gave her daughter the name of [K.] because she knew [Father] would remember her that way . . . . This was because [Father] . . . had a stepdaughter" with that name. De Poorter testified that at a prior court hearing Father told De Poorter that

6

Mother had made these statements. The trial court could find De Poorter's testimony was credible, and that it impeached Father's testimony and showed that Father had notice of his paternity.

The trial court also found internal conflicts in Father's testimony. Father said he "totally" believed he was not the biological father. But during further questioning he said that while he was in prison he believed he might be the father. The court could properly resolve this conflict against him in making its findings. (*In re E.L.B.*, *supra*, 172 Cal.App.3d at p. 788.) It could reasonably infer his statement about gambling odds which he "lost" to be evidence of a "laissez faire attitude" toward parental obligations which showed the reason why he did not promptly take action. (*Adoption of A.S.*, *supra*, 212 Cal.App.4th at p. 212.)

De Poorter's testimony supports a finding that Father had known for two years that he could be the father, but took no action. There is no evidence he had any relationship with this child. The trial court could reasonably reject his claim that he took all reasonably prompt steps to assume parental responsibility. Father has not shown error.

Moreover, DSS contends that even if Father had established he was entitled to a presumed father status, he was not entitled to family reunification services because of his criminal history. In its second addendum report, it said if Father "were to be elevated to presumed father status," he could be subject to a bypass of reunification services under section 361.5, subdivision (b)(12).

Section 361.5, subdivision (b)(12) provides, in relevant part, that family reunification services "need not be provided" where "the parent or guardian of the child has been convicted of a violent felony." In its addendum report No. 3, DSS said Father had been convicted of robbery, assault with great bodily injury, burglary, "domestic battery," "child endangerment," and other crimes. It said he also was "extradited and served a prison sentence for a Burglary he committed" in another state. The evidence DSS presented regarding his criminal convictions is uncontradicted.

7

"Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) Section 361.5, subdivision (c) "prohibits the court from ordering reunification . . . 'unless the court finds . . . that reunification is in the best interest of the child.'" (*In re Kobe A.* (2007) 146 Cal.App.4th 1113, 1123.)

Here the trial court found reunification services to the Father "will not benefit the child," and any contact or visitation was "not in [the] minor's best interest." Those findings are supported by the record. DSS said reunification services would not be in the child's "best interest" because: 1) Father "does not have any relationship with [K. L.]," 2) "[Father] has been incarcerated for a violent felony for the previous two years," and 3) Father "has not shown a pattern of behavior consistent with an ability to provide a physically and emotionally safe home for [K. L.]." In his testimony Father did not state his current monthly income or disclose his personal financial resources to be able to support this child. He said he and three other adults share the rent for an apartment. Father and another adult who lives in that apartment have criminal records. Father is on parole, the other adult is on probation. Father did not know what crime the other man committed. Father said he has a "medical marijuana card," which he obtained in 2008, before he went to prison for robbery. But he did not mention what current medical condition he has that authorized the use of that substance. DSS said he has a history of arrests for possession of controlled substances. Father told DSS that his history of using methamphetamine "tended to contribute to criminal activity."

Father said he was motivated to care for this child. He testified, "I'm good around my children." But he has a 2007 conviction for child endangerment. A DSS report indicated that in a prior domestic violence incident the victim was the mother of another one of his children. DSS said "[i]t was reported" that he had "grabbed [her] by her wrist, and twisted her arm behind her head." He has a 2012 conviction for assault with great bodily injury. Father has not shown why the trial court could not reasonably

8

find he did not make a sufficient showing to challenge the DSS assessment that he could not provide a safe environment for this child. He has not shown error.

*Bypassing Reunification Services for Mother*

Mother claims there is no evidence to support the trial court's finding that reunification services should be bypassed because of a history of drug abuse and resistance to treatment under section 361.5, subdivision (b)(13). We disagree.

"Section 361.5, subdivision (b)(13) provides that reunification services need not be provided to a parent or guardian who 'has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior court-ordered treatment for this problem during a three-year period immediately prior to the filing of the petition that brought that child to the court's attention.'" (*In re Brooke C.* (2005) 127 Cal.App.4th 377, 382.) "Resistance to prior treatment for chronic use of drugs may be shown where the parent has participated in a substance abuse treatment program but continues to abuse illicit drugs." (*Ibid.*)

Mother testified she began "using meth" in 1999. She said she had lost parental rights to another child because of her drug abuse problem. She continually used drugs as part of her "lifestyle" until the birth of K. L. On August 18, 2010, she was arrested for "being under the influence." She was pregnant with K. L. at that time.

Mother claims her testimony shows that she maintained continuous "sobriety" for three years after August 2010. But the credibility of that testimony was a matter for the trial court. (*Bazaure v. Richman*, *supra*, 169 Cal.App.2d at p. 222.) Moreover, she used methamphetamine again in November 2013. She claims this was only a short relapse and should not have been considered resistance to treatment. But this was not a single event. She admitted using this drug four times since November 2013. She also testified she received "a great deal of education about how to deal with [her] addiction." But she admitted that history of drug rehabilitation services "didn't seem to help [her] avoid the use of methamphetamine" in November 2013.

DSS recommended against reunification services because of Mother's longstanding inability to overcome her drug abuse problems. De Poorter testified Mother

9

has a history of receiving drug treatment rehabilitation services. "[S]he's been able to access services prior to this, but if you end the services, she has relapsed each time." Mother has not shown why the trial court could not reasonably find her chronic drug addiction and resistance to treatment placed the child's safety at risk. She has not shown error.

The petitions filed by Mother and Father are denied.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____

J. Barry Smith for Petitioner S.L.

Mary Ann Foster for Petitioner J.S.

No appearance for Respondent.

Rita L. Neal, County Counsel, Leslie H. Kraut, Deputy County Counsel, for Real Party in Interest.