Filed 5/17/23  In re D.L. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re D.L., a Person Coming Under the Juvenile Court Law. | B319995 (Los Angeles County Super. Ct. No. 20LJJP00019) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. DAVON L. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Donald A. Buddle, Jr., Judge.  Conditionally reversed with directions.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant Davon L.

Maureen L. Keaney, under appointment by the Court of Appeal, for Defendant and Appellant Sarah T.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, William D. Thetford and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Davon L. (father) (born September 2004) and Sarah T. (mother) (born November 2004) separately appeal from the juvenile court's order terminating their parental rights to D.L. (born December 2019) pursuant to Welfare and Institutions Code section 366.26. The parents were both 15 years old at the time of D.L.'s birth. Father contends that the juvenile court should have appointed a guardian ad litem for him as a matter of law; that he was not properly noticed for the section 366.26 hearing; that the juvenile court erred in failing to determine if he was D.L.'s biological or presumed father; that the juvenile court improperly determined that he had been granted reasonable services at the six-month review hearing; and that the Los Angeles County Department of Children and Family Services (DCFS) failed to conduct a sufficient initial inquiry under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and California's equivalent law (Welf. & Inst. Code, § 224 et seq.).[1]

Mother asserts no independent claim of error but contends that if the order terminating parental rights as to father is

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

reversed, this court should also reverse the order terminating her parental rights.

DCFS concedes the matter should be remanded with direction to the juvenile court to determine if father is D.L.'s biological father. DCFS also requests this court conditionally affirm the order terminating parental rights and remand with direction to the juvenile court to order DCFS to conduct a further ICWA inquiry. We find that conditional reversal with a limited remand to determine father's status and comply with ICWA is appropriate in this case.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**The family**

Father and mother were both 15 years old at the time the proceedings commenced. Father was a prior dependent of the juvenile court and has been incarcerated since the time of D.L.'s birth and throughout the proceedings.

Mother too has an extensive child welfare history as a minor. She also had a criminal history with the juvenile delinquency court system. During these proceedings, she was on probation for fighting and had experienced many suspensions and school expulsions for uncontrolled anger and instances of peer fighting. At the time of D.L.'s birth, mother was residing with the paternal grandmother (PGM).

**Petition and Detention**

On December 6, 2019, DCFS received a referral alleging mother, who had not received prenatal care, tested positive for marijuana when she gave birth to D.L. The test results showed

3

high levels of marijuana. DCFS did not then detain D.L. from mother.

On December 12, 2019, a DCFS social worker made an unannounced visit at PGM's home. Mother admitted to smoking marijuana while pregnant with D.L. and identified father as D.L.'s biological father. Mother had been in a relationship with father for about two years. She and father would often run away together. Mother would run away mainly because she did not get along with maternal grandmother (MGM).

Father was incarcerated continuously since September 19, 2019. Mother explained that father was one of four who had been involved in seven robberies of different liquor stores. Father shot at a cashier but did not hit him. The gun father used did not belong to him, but law enforcement found the gun during a search of father's home. Father told mother he committed the crimes so that they would have money for the baby. Mother hoped father would come out of jail a changed person.

Mother admitted being on probation, acknowledging she was in a fight and stole the phone of the girl that she assaulted. Mother saw her actions were wrong and wanted to change in order to be a positive influence for her baby. Mother was open to services.

On December 16, 2019, a DCFS social worker met with father at Barry J. Nidorf Juvenile Hall. Father believed he was D.L.'s biological father. When informed that mother tested positive for marijuana at the time of D.L.'s birth, father became visibly upset and asked if the baby was okay. He said he would speak with mother and make sure she was no longer using marijuana now that she had the baby. Father appeared comfortable talking with the social worker. He seemingly

4

understood the conversation and appeared to be developmentally on target as evidenced by his level of communication.

Father reported being charged with five armed robberies and two attempted murders. Father said he would not be released until after he turned 18 years old. While incarcerated, father intended to focus on school so he could get a good job to support D.L. when he was released. Father claimed his relationship with mother was good, and they spoke on the phone frequently. Mother could not visit him, however, because she was a minor.

PGM was also interviewed and admitted she had cases with DCFS due to past drug use. PGM also had a criminal history. She reported being drug free for over seven years and credited DCFS for her sobriety and current stability. Mother had been living with PGM since mother learned she was pregnant. PGM said she was in the process of obtaining legal guardianship over mother. She was concerned mother would leave her home with no real plan. The social worker asked to be informed if mother left the home and to be kept informed about the status of the guardianship.

A children and family team meeting (CFT meeting) was held on January 2, 2020. Mother was unable to share information regarding the infant's schedule and was unaware of any of D.L.'s developmental milestones. Mother had been spending time with friends and leaving D.L. with PGM, who was primarily caring for D.L. Because mother had no direct parenting responsibility with D.L. and was desirous of "running the streets and hanging with her friends," the social worker spoke with PGM about the possibility of a guardianship. PGM was uncertain about what she needed to do or whether DCFS

would support PGM in seeking legal guardianship. A parenting class for both mother and PGM was suggested. Mother and PGM were also informed of "Project Fatherhood," a program for father to participate in when he was released from jail.

At a second meeting on January 3, 2020, the social worker informed mother that the case would be promoted to a family maintenance case and it would be requested that mother drug test. As a condition of the family maintenance arrangement, DCFS would ask that mother and D.L. remain in the care of PGM. However, DCFS informed mother that were D.L. to be detained, PGM would not be approved due to her extensive history with DCFS. Paternal aunt Monique S. was identified as a potential placement of D.L.

On January 10, 2020, DCFS filed a section 300 petition on behalf of D.L. The petition alleged that the child was a person described under section 300, subdivision (b) because she was born with a positive toxicology for marijuana; mother had a history of substance abuse and was a current abuser of marijuana and alcohol; and father knew or should have known of mother's substance abuse and failed to take action to protect the child.

DCFS attempted to notify father of the detention hearing by telephone, but was informed father was not permitted to take a telephone call. The custody officer that answered agreed to provide father with the social worker's contact information.

The detention hearing was held on January 13, 2020. Father was not present, and the court was informed of father's detention at Barry J. Nidorf Juvenile Hall and was provided with the address of the facility.

Mother was present and completed a parentage questionnaire. Mother believed father was D.L.'s father, though

6

he was not present at the child's birth; he did not sign the birth certificate or other paperwork naming him as D.L.'s father; he and mother were not married or in a registered domestic partnership at either the time of the child's conception or birth; and he and mother were not living together at the time of the child's conception and birth. Mother said father openly held himself out as D.L.'s parent and had received the child into his home. No paternity tests had been conducted. The parentage form also noted that father was incarcerated at juvenile hall. The court deferred its decision on parentage until father's appearance.

The court found a prima facie case for removing D.L. from the parents' custody, but allowed the child to remain with mother on the condition that she reside in the home of PGM. The court ordered monitored visits for father once he was released from custody.

**Arraignment**

Father was not transported to the arraignment hearing on January 22, 2020, so the court continued the hearing to February 14, 2020.

Father was present at the continued arraignment hearing and was appointed legal counsel. He also filed a JV-505 statement regarding parentage (JV-505) in which he stated his belief that he was D.L.'s parent and requested a judgment of parentage. The JV-505 also stated that father had told paternal grandparents that D.L. was his child and asked the court to find he was the presumed father. Father did not check the box indicating that the child had lived with him for any period of time.

Father also filed a JV-140 notification of mailing address that provided his juvenile number and his mailing address at Barry J. Nidorf Juvenile Hall. The juvenile court admonished father that if his mailing address changed it was important that the court, his attorney, and the social worker be notified. The court said it would be sending notices to the address on father's JV-140 form, and the court could proceed even if father was not present. The court asked if father understood the court's admonishments regarding his address, and father responded in the affirmative.

The court then questioned father about his JV-505, asking if he had received D.L. into his home. Father responded in the affirmative. Father's attorney interjected that father had been incarcerated since before the child was born, which father confirmed. Father's attorney informed the court that father had not yet met D.L., but the child was residing in the home of PGM, where father resided before being incarcerated. The court then deferred a decision on parentage, noting, "Mother is not here and we may need to just explore this in a little more detail before I can make a definitive parentage decision." Father's attorney did not object.

Father's attorney acknowledged it was impossible for father to care for D.L., but asked the court to release the child to father. DCFS objected, stating that, as an alleged father, father was not entitled to custody, and he had several felony charges, including attempted murder pending. The juvenile court did not grant release to father at that time.

**Jurisdiction/disposition report**

Father was interviewed for the jurisdiction/disposition report and indicated he did not know that mother was using

8

drugs or alcohol while pregnant. Mother found out she was pregnant when she was approximately three months into the pregnancy; at that time mother and father began living together. Father was incarcerated when mother was approximately eight months pregnant and did not know if she started using marijuana after that.

Father reported that while in juvenile hall he was actively in school to earn a high school diploma. He was in the ninth grade and was hoping to graduate so that, when released, he could seek employment to support his family. Father admitted a lengthy criminal history. His first arrest was for grand theft auto, and he had three separate probation violations. He was currently serving time for five armed robbery charges and two charges of attempted murder. He did not expect to be sentenced for a year. Father reported to have been diagnosed with attention deficit hyperactivity disorder and oppositional defiance disorder and was currently taking two medications for these conditions.

Mother acknowledged smoking marijuana both before and after she discovered she was pregnant. Mother reported feeling stress about being pregnant and feeling even more stress after father was incarcerated. Mother reported not knowing it was "bad" to smoke during pregnancy. Mother said she was living in PGM's home after having been kicked out of MGM's home. Mother smoked marijuana since the age of 13. She began smoking to self-medicate due to a strained relationship with MGM. After the birth of D.L., mother continued to associate with the same friends with whom she had a history of smoking marijuana.

9

**Jurisdiction/disposition hearings**

DCFS sent father notices of the February 24, 2020 jurisdiction hearing to PGM's home and the Barry J. Nidorf Juvenile Hall. Father was present with counsel. The court continued the hearing to February 27, 2020.

Father was not present at the February 27, 2020 hearing but was represented by counsel. Mother entered a no-contest plea, and the juvenile court sustained the dependency petition with minor amendments.

The court declared D.L. a dependent of the court, removed the child from father's custody, and allowed her to remain with mother with family maintenance services in place. Enhancement services were ordered for father.

Father was ordered to submit to random or on-demand weekly drug and alcohol testing, complete a parenting program, and participate in individual counseling. The court ordered monitored visitation in compliance with the rules and regulations of father's place of incarceration.

Mother was ordered to complete a full drug and alcohol program with weekly random or on-demand drug and alcohol testing, a parenting program, and to participate in individual counseling. The child's release to mother was conditioned on mother residing with PGM or at another DCFS-approved location. The court set a six month review hearing for August 27, 2020.

**Section 387 petition**

On May 29, 2020, DCFS filed a petition for authorization to remove D.L. from mother's custody. Mother had failed to show for any drug test, nor had she enrolled in parenting or individual

counseling. Father was unable to enroll in any of the court-ordered programs due to his incarceration.

On April 3, 2020, a DCFS social worker had made an unannounced visit to PGM's home and smelled a strong odor of marijuana. The social worker found an open container of prescription pills lying on the counter. Mother acknowledged not having submitted to any drug test. She also refused to provide information regarding an unidentified male in the house.

On April 29, 2020, PGM told the social worker that mother was frequently out of the home. Mother confirmed she was still not participating in drug testing or services. During a meeting on May 11, 2020, mother reported she did not like being a mother and felt she was not able to provide appropriate care for the child. Mother made concerning statements regarding continued drug use and being tired of parenting. PGM also reported that mother would leave the home for days and leave the baby. When mother was away, PGM would be unaware of mother's whereabouts, and mother would not check on the baby's welfare. Mother was not enrolled in school or any of the court-ordered programs.

DCFS asked the juvenile court to authorize D.L.'s removal from mother, identifying PGM as a possible placement source. PGM was completing the resource family approval (RFA) application process.

The juvenile court ordered DCFS to remove D.L. from mother's custody. D.L. was then placed with paternal aunt Monique S.

On June 2, 2020, DCFS filed a supplemental juvenile dependency petition pursuant to section 387, alleging mother would leave the home for days without making an appropriate plan for D.L.'s ongoing care and supervision and failed to

11

maintain contact with the caregiver.  The petition further alleged that mother had failed to drug test and to participate in a substance abuse program, parenting program, or individual counseling.

The detention hearing was held on June 5, 2020.  Neither parent was present, but both were represented by counsel.  The juvenile court made detention findings as to mother and set the matter for a hearing.

A dependency investigator (DI), who was investigating the section 387 allegations, interviewed PGM on July 8, 2020.  PGM confirmed mother would leave D.L. in her care for days at a time without telling PGM where she was going.  Once mother was away for an entire week.  Since D.L. had been removed, mother no longer lived with PGM.  PGM wanted to help mother but could not take responsibility for her because most of the time she did not know where mother was.

In an interview with a paternal uncle on July 8, 2020, the DI was told that mother had been leaving the child with PGM for days at a time and began staying away for up to a week without telling anyone where she was or when she would return.

In a July 9, 2020 interview, mother admitted she had left PGM's home without D.L. twice but said she always remained in contact with PGM.  When informed that PGM said otherwise, mother stated that PGM was lying.  Mother admitted she was not drug testing or participating in programs.

Paternal aunt Monique S. advised that she was willing to adopt D.L.

On August 27, 2020, the juvenile court sustained the section 387 petition with a minor amendment, ordering DCFS to provide reunification services to mother and father.  Father's case

plan required him to submit to on-demand drug tests and complete a full drug program if any test was missed or positive, complete a parenting program, participate in family preservation services and individual counseling, and comply with all orders of the criminal court and probation department. Father was granted monitored visits.

The court set a hearing pursuant to section 366.26, subdivision (e) for March 1, 2021.

**Six-month status report and hearing**

At the time of the six-month status hearing, mother was living with MGM. Father remained incarcerated.

Paternal aunt Monique S. had not begun the RFA process, nor had she participated in counseling or a parenting class. In December 2020, Monique S. complained she could not live her life because she had to care for D.L. During an unannounced visit to Monique S.'s home on December 27, 2020, the social worker observed marijuana and a bong inside the home, which was filled with marijuana smoke.

On January 28, 2021, D.L. was removed from Monique S. and placed in the home of Ms. L., who was willing to provide care for D.L., but not on a long-term basis.

Due to father's incarceration, he could not be referred to random or on-demand drug or alcohol testing. On October 23, 2020, DCFS sent father referrals for parenting classes. Due to his incarceration, father was not eligible to receive family preservation services.

During the period of review, the social worker mailed father monthly contact letters to which father did not contact the social worker or otherwise respond. Father had not provided DCFS with information regarding enrollment in, or completion

13

of, services. Father had not visited with D.L. due to his incarceration.

Mother was not in compliance with the court-ordered case plan and had been terminated from a drug program for lack of cooperation and attendance.

DCFS recommended termination of family reunification services and that a section 366.26 hearing be set.

Attached to DCFS's report was a "Notice of Review Hearing—Juvenile" showing notice to father of the March 1, 2021 review hearing. Also attached was a proof of service indicating that it was mailed to father, but not the address to which it was mailed.

Father did not attend the March 1, 2021 review hearing. His attorney was present. The court continued the hearing to March 17, 2021. Counsel was ordered to notice their clients of the continued hearing date.

Father did not attend the continued review hearing but was represented by counsel. The juvenile court found notice of the proceedings was proper and admitted DCFS's report into evidence. Father offered no evidence and did not object to notice. The child's attorney joined with DCFS to request termination of reunification services.

Counsel noted father had not participated in any services and made no effort to contact DCFS despite DCFS's efforts to contact father. DCFS argued that there was no substantial likelihood D.L. would be returned to either parent if the parents were given an additional six months of services. Mother's attorney argued the opposite. Father's attorney informed the juvenile court that she had no contact with father so had no direction from him, but objected to terminating father's services.

The juvenile court found continued jurisdiction was necessary because the conditions that justified jurisdiction still existed.  It also found that DCFS had provided reasonable services, and both parents failed to participate regularly or make substantial progress in their case plans.  The court terminated family reunification services and set a section 366.26 hearing for July 15, 2021.

**Writ petition**

Father was mailed notice of the need to challenge the section 366.21, subdivision (e) findings and orders by way of writ petition.  On March 18, 2021, a notice of intent to file writ petition to challenge the termination of services and the setting of the section 366.26 hearing was filed.  Father's court-appointed attorney filed a letter pursuant to *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570, 585.[2]  The proceeding was deemed a nonoperative writ on May 13, 2021.  (*D.L. v. Superior Court* (May 13, 2021, B311230) [nonpub. order].)

**Status reports**

In July 2021, DCFS reported that D.L. remained placed with Ms. L., with whom the child was developing a strong bond.  During visits to the home, the social worker observed the child walking, running, and attempting to speak; she was comfortable

---

[2]     In *Glen C. v. Superior Court, supra*, 78 Cal.App.4th at page 585, the court held that it was a father's burden to prove by a preponderance of the evidence that he was a presumed father.  Because there was insufficient evidence in the record that the father was a presumed father, he was not entitled to reunification services.  (*Id.* at p. 586.)  Father's extraordinary writ challenging the juvenile court order terminating reunification services was therefore denied.

15

in the home and the caregiver reported that she was doing well. Adoption was identified as the permanent plan.

Father remained incarcerated, did not contact DCFS for visits or phone calls, and had no virtual or in-person contact with D.L.

During the reporting period, mother had in-person monitored visits with D.L. MGM expressed interest in adopting D.L. and was sent a letter outlining the RFA application process. Thereafter, MGM withdrew her application. DCFS reported it was therefore focusing on adoption by Ms. L. as D.L.'s permanent plan.

During a July 19, 2021 CFT meeting, mother requested that D.L. be placed with MGM. DCFS again referred MGM to the RFA process. MGM again withdrew her application because she did not have a valid identification card. MGM reported that she had an appointment to get an identification card and would resume the RFA process at that time.

For the September 17, 2021 status review hearing, DCFS sent notice to father's place of incarceration. Father did not attend the review hearing. The juvenile court found notice proper and set another review hearing for March 17, 2022.

**Section 366.26 reports and hearing**

DCFS's report for the October 15, 2021 section 366.26 hearing indicated father was transferred to Dorothy Kirby Center in Commerce, California. DCFS then personally served father with notice of the October 15, 2021 section 366.26 hearing.

Father attended the October 15, 2021 hearing via WebEx and was represented by counsel. Father's counsel informed the juvenile court that father wanted paternal great aunt, Robyn J.,

16

assessed for placement. DCFS was then ordered to assess Robyn J. for placement.

Father's attorney did not object to notice. The juvenile court found notice was proper and ordered DCFS to provide notice of the next hearing. Father's attorney asked that the record reflect that father could appear for the continued hearing via WebEx, which the court granted. The section 366.26 hearing was continued to January 18, 2022.

On November 3, 2021, Robyn J. informed the court that she was pregnant and therefore not a candidate for placement. DCFS had no update on MGM's RFA process. A CFT meeting was scheduled with mother and MGM to discuss the RFA and possible placement of the child with MGM, but mother and MGM did not attend. In December 2021, DCFS was unable to contact MGM's RFA coordinator. Therefore, DCFS was unable to place D.L. with MGM and continued to recommend adoption by Ms. L.

On January 3, 2022, DCFS mailed the parties courtesy notice via first class mail.

Father did not attend the January 18, 2022 section 366.26 hearing but was represented by counsel. The juvenile court found notice proper and continued the hearing to February 17, 2022.

Notice of the February 17, 2022 hearing was sent to father at his place of incarceration. Father did not attend the hearing but was represented by counsel. The juvenile court continued the hearing at the request of DCFS and with the consent of all parties to March 17, 2022.

Notice of the March 17, 2022 hearing was mailed to father at the Dorothy Kirby Center on March 1, 2022.

Father did not attend the March 17, 2022 hearing but was represented by counsel, who represented to the court that father was not present because he was incarcerated. The court found notice proper. The court set another review hearing for September 19, 2022, continued the section 366.26 hearing to April 18, 2022, and ordered courtesy notice.

On April 13, 2022, DCFS sent father notice of the April 18, 2022 hearing at his place of incarceration via first class mail.

Father did not attend the April 18, 2022 section 366.26 hearing but he was represented by counsel. The court found notice proper, and father's attorney did not object to notice.

Father's attorney stated, "On behalf of [father], I would ask for a continuance. [Father] is under the age of 18 and is in custody. . . . Typically, [father] is made available via WebEx and is able to call into court. However, that is not the case today. I do note that [father] might be at a different facility than he has been previously. [¶] I have tried reaching out to his parole officer and [have] not been able to speak to her. So I would ask that the matter be continued briefly so that he be able to appear." Counsel objected to going forward with the hearing that day and to terminating father's parental rights. Counsel stated she had no direction from father but did not think that she would be asking to set it for a contest. Counsel stated that based on her review of the case, she was not certain there was a basis for father to set the matter for a contest.

Mother's attorney asked the juvenile court to continue the hearing and set it for contest, stating that, since her release from a rehabilitation program, mother had been visiting D.L. every Thursday for three hours. Counsel added that mother would be

18

asserting the beneficial parent-child relationship exception to termination of parental rights.

D.L.'s attorney objected to mother's and father's requests to continue the hearing, noting that at the last hearing there had been no request for father to appear at this one. Counsel also noted that DCFS's reports did not support mother's claim of consistent visits or a bond necessary to support the beneficial parent-child relationship exception to termination of parental rights.

DCFS also objected to mother's and father's requests to continue the hearing, noting that Penal Code section 2625 entitled father to request to be transported to the hearing from his place of incarceration; however, such a request had to be made when the hearing was set. No prior request was made. County counsel also noted that father was an alleged father, which meant that he had no right to contest the section 366.26 hearing or request a continuance for the purpose of contesting termination of parental rights. Father's counsel did not seek to elevate father's paternity status or otherwise address the issue of father's status.

The juvenile court denied mother's and father's requests to continue the hearing. D.L.'s attorney asked the court to terminate parental rights. Mother and father objected, arguing that legal guardianship was a more appropriate plan.

The juvenile court found that notice was proper, D.L. was adoptable, there were no legal impediments to adoption, and no exception to termination of parental rights applied. The court then terminated parental rights.

On April 18, 2022, mother filed a notice of appeal. On May 18, 2022, father filed a notice of appeal.

## DISCUSSION

I. **Guardian ad litem**

A. *Sua sponte appointment of a guardian ad litem was not required*

Father first argues the order terminating parental rights and all prior orders must be vacated due to the juvenile court's failure to sua sponte appoint a guardian ad litem for father. Father argues that the court's failure to appoint a guardian ad litem rendered the proceedings fundamentally unfair.

Father relies on Code of Civil Procedure section 372. Code of Civil Procedure section 372, subdivision (a)(1) provides generally that "[w]hen a minor . . . is a party, that person shall appear either by a guardian or conservator of the estate or by a guardian ad litem appointed by the court . . . ." However, subdivision (c) of the statute provides, in relevant part: "Notwithstanding subdivision (a), a minor may appear in court without a guardian ad litem in the following proceedings if the minor is a parent of the child who is the subject of the proceedings: [¶] . . . [¶] (B) Dependency proceedings pursuant to Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code." However, "[i]f the court finds that the minor parent is unable to understand the nature of the proceedings or to assist counsel in preparing the case, the court shall, upon its own motion . . . , appoint a guardian ad litem." (Code Civ. Proc., § 372, subd. (c)(2).)

Father acknowledges that subdivision (c) was added to Code of Civil Procedure section 372 in 2008. (Stats. 2008, ch. 181, § 1.) However, he argues that subdivision (c) of Code of Civil Procedure section 372 did not relieve the juvenile court of

20

its sua sponte duty to appoint a guardian ad litem for him. Father contends that pursuant to subdivision (a), the court is required to sua sponte appoint a guardian ad litem for a minor parent, and subdivision (c) is applicable only if the minor parent objects to the appointment of a guardian ad litem or requests to appear without a guardian ad litem.

We disagree with father's interpretation of Code of Civil Procedure section 372, which would render subdivision (c) meaningless. We cannot interpret Code of Civil Procedure section 372 as requiring appointment of a guardian ad litem for a minor parent in a dependency proceeding when subdivision (c) expressly makes such appointment discretionary. (*Thornburg v. Superior Court* (2006) 138 Cal.App.4th 43, 49 [canons of statutory construction "'generally preclude judicial construction that renders part of the statute "meaningless or inoperative"'"].) Code of Civil Procedure section 372, subdivision (c)(1) expressly states that it applies "[n]otwithstanding subdivision (a)." Thus, to the extent that subdivision (a) conflicts with subdivision (c), subdivision (a) is inapplicable. (See *Arias v. Superior Court* (2009) 46 Cal.4th 969, 983 [holding that a "notwithstanding" clause renders provisions of law that conflict with the statute's provisions inapplicable].) Code of Civil Procedure section 372, subdivision (a)'s mandate is thus inapplicable in dependency proceedings in which a minor is a parent of the child who is the subject of the proceedings.

Our interpretation of Code of Civil Procedure section 372, subdivision (c) is bolstered by a similar provision found in the Welfare and Institutions Code. Section 326.7 of the Welfare and Institutions Code provides that "[a]ppointment of a guardian ad litem shall not be required for a minor who is a parent of the

21

child who is the subject of the dependency petition, unless the minor parent is unable to understand the nature of the proceedings or to assist counsel in preparing the case."[3]  An interpretation of Code of Civil Procedure section 372 requiring a juvenile court to appoint a guardian ad litem would create a conflict with this provision of the Welfare and Institutions Code. We must, ""'where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions.'""" (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 955.) Therefore, contrary to father's proposed interpretation, we interpret Code of Civil Procedure section 372 to be consistent with Welfare and Institutions Code section 326.7.[4]

Father cites several cases that predate the addition of subdivision (c) to Code of Civil Procedure section 372 and the enactment of Welfare and Institutions Code section 326.7.  *In re James F.* (2008) 42 Cal.4th 901, 904-905 (*James F.*) involved the question of whether a juvenile court's error in failing to appoint a guardian ad litem for a minor parent was subject to a harmless error analysis.  *James F.* did not involve a minor parent, but

---

[3]     Section 326.7 became effective January 1, 2009.  (Stats. 2008, ch. 181 § 3.)

[4]     Family Code section 7635, subdivision (b) also provides that "[a]ppointment of a guardian ad litem shall not be required for a minor who is a parent of the child who is the subject of [a] petition to establish parental relationship, unless the minor parent is unable to understand the nature of the proceedings or to assist counsel in preparing the case."  Our interpretation of Code of Civil Procedure section 372 also harmonizes with this Family Code provision.

22

involved an incompetent parent who suffered from numerous emotional and mental problems.  (*Id.* at p. 905.)  The juvenile court appropriately appointed a guardian ad litem for the incompetent father, but made the appointment without explaining to the parent the nature and purpose of a guardian ad litem, and without giving the parent the opportunity to be heard in opposition to the appointment.  (*Id.* at p. 911.)  DCFS conceded the error.  (*Ibid.*)  The *James F.* court concluded that "a juvenile court's error in the process used for appointment of a guardian ad litem for a parent in a dependency proceeding is a form of trial error that is amenable to harmless error analysis."  (*Id.* at pp. 918-919.)  The case does not suggest that appointment of a guardian ad litem was necessary or required in this matter.

  *In re D.D.* (2006) 144 Cal.App.4th 646, 648 (*D.D.*), involved a father who was 17 years old when a dependency petition was filed on behalf of his two-month-old child.  The father did not appear at the detention hearing or jurisdiction hearing and was not appointed an attorney or a guardian ad litem.  (*Id.* at p. 650.)  The jurisdiction reports indicated the father's whereabouts were unknown, and he was receiving government payments due to a developmental disability.  (*Id.* at p. 651.)  During the six-month review period, both parents were arrested and incarcerated for probation violations.  (*Id.* at pp. 651-652.)  However, upon his release the father appeared at a section 366.21 review hearing and was appointed an attorney and guardian ad litem.  (*Id.* at p. 652.)  After the juvenile court terminated reunification services, the father appealed, arguing that the juvenile court erred in failing to appoint a guardian ad litem or an attorney for him at the detention or jurisdictional hearings.  (*Ibid.*)  Relying on subdivision (a) of Code of Civil Procedure section 372, the *D.D.*

court concluded that the juvenile court had an obligation to appoint a guardian ad litem for a minor who was a party to an action. Despite the father's failure to appear at the early hearings in the matter, the *D.D.* court held that the proceedings were fundamentally unfair, due to the fact that the father had neither an attorney nor a guardian ad litem to represent him, and vacated all findings subsequent to the detention hearing. (*D.D.*, at pp. 654-655.)

The amendment to Code of Civil Procedure section 372 adding subdivision (c) occurred subsequent to the *D.D.* decision, as did the addition of section 326.7. Thus, the *D.D.* court could not have considered it, nor did the *D.D.* court consider the provision of the Family Codes discussed above. The case does not suggest that appointment of a guardian ad litem was mandatory in this matter under the current law.

*In re M.F.* (2008) 161 Cal.App.4th 673, 676 (*M.F.*), involved a mother who was 14 years old when she gave birth to the minor. The petition alleged that the mother had been subjected to ongoing sexual abuse by her stepfather, which resulted in the mother's pregnancy. The child and the mother were the subjects of two separate dependency proceedings. The mother failed to reunify with the child. The mother was not appointed a guardian ad litem until the section 366.26 hearing. After her parental rights were terminated, she argued on appeal that the juvenile court erred by failing to appoint her a guardian ad litem earlier in the proceedings. (*M.F.*, at p. 678.) The *M.F.* court agreed, relying on Code of Civil Procedure section 372, subdivision (a). (*M.F.*, at p. 678.)

Rejecting mother's argument that the error was jurisdictional, the *M.F.* court performed a harmless error analysis

24

and concluded that the mother's rights had been compromised at key hearings as a result of the court's failure to appoint a guardian ad litem. (*M.F., supra*, 161 Cal.App.4th at pp. 680-681.) The court thus vacated the order terminating parental rights and all prior orders and remanded the matter to conduct a new jurisdictional hearing. (*Id.* at p. 683.)

The subsequent enactment of Code of Civil Procedure section 372, subdivision (c), as well as Welfare and Institutions Code section 326.7, renders *M.F.* unpersuasive. We conclude that the juvenile court was not required to appoint a guardian ad litem in this matter.[5]

### B. *Father was able to understand the proceedings*

Under Code of Civil Procedure section 372, subdivision (c), and Welfare and Institutions Code section 326.7, the juvenile court is not required to appoint a guardian ad litem unless the juvenile court determines that the minor parent is unable to understand the nature of the proceedings or assist counsel in preparing the case. There was no evidence that father fell under

---

[5] We reject father's argument that Code of Civil Procedure section 372, subdivision (c) violates the due process clause of the Fourteenth Amendment to the United States Constitution, as well as article I, section 7 of the California Constitution. Father provides only broad arguments that the lack of a requirement to appoint a guardian ad litem for a minor parent in every proceeding is simply unfair. Father fails to draw parallels to relevant case law or any decisional law suggesting that such a law is unconstitutional. The current statutory scheme permits appointment of a guardian ad litem if necessary, but it is not required. Father has failed to draw our attention to any legal authority suggesting this procedure is unconstitutional.

either of these two categories.  In fact, the opposite appeared to be the case.

When father was first interviewed in custody, he made appropriate eye contact with the social worker and was "cooperative and forthcoming."  He did not appear to be uncomfortable communicating with the social worker and "his answers appeared to be genuine."  The social worker noted that "father appeared to be developmentally on target as evidenced by his level of conversation."  Father showed appropriate concern for mother and the baby upon learning that the baby had tested positive for marijuana at birth.

Father's appointed attorney did not inform the court of any difficulty communicating with father, nor did the attorney ever request the appointment of a guardian ad litem.

During father's arraignment, father filed a JV-505 that requested a judgment of parentage as well as a JV-140.  The juvenile court discussed these documents with father, who indicated that he understood the court's admonishments.  The court had no reason to believe father did not understand the proceedings, thus its failure to appoint a guardian ad litem was not error.[6]

## II.  Failure to determine father's status as presumed or biological father

On February 14, 2020, father filed a JV-505 requesting a judgment of parentage.  DCFS concedes that the JV-505 required the court to determine whether father was D.L.'s biological father and presumed parent.  (Cal. Rules of Court, rule 5.635(h); *In re*

---

[6]     Because we have determined that the court's failure to appoint a guardian ad litem was not error, we decline to address father's arguments that such error was prejudicial.

26

*Baby Boy V.* (2006) 140 Cal.App.4th 1108, 1118.) DCFS further concedes that the court's failure to do so was error. (*In re B.C.* (2012) 205 Cal.App.4th 1306, 1313.) We accept the parties' agreement on this point and agree the juvenile court's failure to make a finding as to parentage was error.

DCFS further concedes that the court's failure to determine if father was D.L.'s biological father was prejudicial to the extent that it deprived D.L. of the medical history of her family and any possible determination that she was an Indian child. For all other purposes, DCFS argues, the court's failure to make a finding as to father's status was harmless error. We agree. (See *James F., supra*, 42 Cal.4th at p. 918 [if the outcome of a proceeding has not been affected by judicial error, such error is harmless and does not require reversal].)

Setting aside issues of medical history and possible Indian heritage, father argues that the court's failure to determine his parentage was prejudicial because, had father been elevated to presumed father status, he could have requested that the child be "placed" with him. Father argues that although he was incarcerated, he could have arranged for D.L.'s temporary care during his incarceration, including with PGM. Thus, father argues, he could have avoided having D.L. removed from his custody.

Father's argument fails for several reasons. First, father was treated throughout the proceedings as if he were a presumed father. He was granted reunification services and PGM was considered for placement. Despite father's failure to elevate to the status of presumed or biological father during the proceedings, the juvenile court ordered DCFS to consider father's relatives for placement. When DCFS removed D.L. from

27

mother's custody, D.L. was placed with paternal aunt Monique. The juvenile court also accepted father's request that the court place D.L. with paternal great aunt Robyn J., ordering DCFS to assess placement with this paternal relative. Robyn J. ultimately was not able to accept the child. DCFS attempted to assist PGM in going through the RFA process. PGM did not complete the process, thus DCFS was not able to place the child with PGM. Although D.L. did not find long-term placement with a paternal relative, the lack of an official finding regarding father's status did not prevent the court from considering paternal relatives requested by father.

Father argues that the child would not need to have been removed from him because he could have arranged for the child to stay with PGM. In making this argument, father ignores the facts in the record showing that D.L. was initially allowed to remain with mother in PGM's home. However, the child was removed from PGM's home due to unsafe conditions. PGM was frequently not at home, and on one unannounced visit the home smelled of marijuana and there was an unidentified male in the home. DCFS eventually had to remove D.L. from the home. Thus, father's claim of prejudice on this point is unpersuasive.

Finally, father was incarcerated before D.L.'s birth and throughout the proceedings for five armed robberies and two attempted murders. Father did not deny the crimes of which he was accused. Thus, even if father had been elevated to presumed or biological father status, the child would not have been placed with father. Father was aware that he was not likely to be released until after he reached the age of 18. Under the circumstances, the juvenile court did not err in denying placement with father and seeking permanency for the child.

We conclude that the juvenile court's error in failing to determine father's parentage was prejudicial only to the extent that it denied D.L. access to her family's medical history and potential history of Indian heritage. As explained in more detail below, we therefore conditionally reverse the matter and remand for a finding as to father's parental status.

## III.  Reasonable services to father

Father next argues that the juvenile court erred in finding that, at the six-month review hearing, DCFS had provided reasonable services to father. Father argues that the record as a whole does not contain substantial evidence from which a reasonable trier of fact could have found that DCFS provided father with such reasonable services.

As DCFS counters, a reasonable services finding made in conjunction with the termination of reunification services and the setting of a section 366.26 hearing is not appealable and must be challenged by extraordinary writ. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452; *In re Tabitha W.* (2006) 143 Cal.App.4th 811, 815-816.) Father's trial counsel filed a notice of intent to file writ petition to challenge the termination of family reunification services, but the matter was dismissed as a nonoperative writ. (*D.L. v. Superior Court* (May 13, 2021, B311230) [nonpub. order].)

Father argues that the juvenile court's failure to appoint father a guardian ad litem impacted his ability to properly challenge the reasonable services finding at the section 366.26 hearing. As set forth above, the juvenile court did not err in failing to provide a guardian ad litem. We therefore reject this argument.

Father further argues that counsel's failure to properly challenge the reasonable services finding via a petition for

29

extraordinary writ was the product of ineffective assistance of counsel and therefore may be raised in this appeal. (Citing *In re S. D.* (2002) 99 Cal.App.4th 1068, 1071.) Father argues that by not raising an objection to DCFS's reasonable services claim at the six-month review hearing, trial counsel rendered ineffective assistance of counsel. Father's claim is belied by the record, which shows that his counsel objected to the order terminating father's reunification services, which would have included the reasonable services finding. Father's trial counsel also filed the notice of intent to file writ petition. An extraordinary writ was filed, challenging the termination of reunification services.[7] Therefore, father's argument has no basis. Father fails to elaborate on the reasons for his ineffective assistance claim, therefore we decline to discuss them.

Finally, we note that any error or ineffective assistance was not prejudicial, as father could not show that DCFS failed to provide reasonable services. The record shows that DCFS provided father with relevant materials and attempted to contact him regarding reunification services. Father did not return the social worker's calls or letters or provide any evidence that he

---

[7] To the extent that father believed it was ineffective assistance of counsel for the attorney that represented him in the writ proceeding to file a letter pursuant to *Glen C. v. Superior Court, supra,* 78 Cal.App.4th 570, father's remedy was a petition for review in the Supreme Court. (Cal. Rules of Court, rule 8.500(a).) Father may not raise issues in this appeal that challenge the validity of a prior appealable order. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1151.)

had attempted to engage in any services.[8]  In addition, father points to no evidence showing that, had he been granted an additional six months of reunification services, the child would have been returned to him. Father was incarcerated and admitted that he would remain incarcerated for several years. Continued reunification services would not have changed this. Thus, father cannot show prejudice from the termination of his reunification services.

Father has failed to show that his present challenge to the reasonable services finding is proper or that prejudicial error occurred.

## IV.    Notice of the continued section 366.26 hearing

Father next argues that the order terminating parental rights must be reversed because the notice provided to father of

---

[8]      *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, cited by father, is distinguishable.  In *Robin V.*, the incarcerated father wrote six letters to his social worker, who only wrote two in response, asking the father what programs he was involved in. In addition, the social worker never reviewed the father's plan with him or gave him advice on programs he could or should be doing.  The incarcerated father had requested parenting materials, which the social worker never provided.  Here, in contrast, the social worker attempted to engage with father and provide support, but father did not respond to the social worker. The social worker wrote father monthly contact letters and provided father with referrals for parenting classes.  Father never responded. The social worker attempted to reach father by telephone, but was informed that father could not receive telephone calls.  The social worker left a return telephone number, but father never returned the telephone call.  Thus, contrary to *Robin V.*, there is no reason to find that reunification services to the incarcerated parent were unreasonable.

the section 366.26 hearing was not reasonable, denying father his right to due process of law.

The section 366.26 hearing was initially set for July 15, 2021. At the hearing, the juvenile court found that notice was not adequate and continued the hearing to October 15, 2021. DCFS personally served father a copy of the notice of the October 15, 2021 section 366.26 hearing. At the October 15, 2021 hearing, father was present and the juvenile court found service proper. The hearing was continued several more times. On March 17, 2022, at the continued hearing, father was not present but was represented by counsel. The court again continued the section 366.26 hearing to April 18, 2022. The court ordered that the parents be provided courtesy notice of the April 18, 2022 section 366.26 hearing.

On April 13, 2022, five days before the April 18, 2022 hearing, DCFS sent father notice of the April 18, 2022 continued hearing via first class mail. Notice was sent to father's then-current place of incarceration at Dorothy Kirby Center in Commerce, California. Father did not attend the April 18, 2022 section 366.26 hearing. However, his counsel was present.

Father claims that notice was insufficient because courtesy notice was mailed to him on April 13, 2022, five days before the April 18, 2022 hearing, via first class mail. Father admits that once the court makes the initial finding that notice has been properly given to the parent, notice of a continued section 366.26 hearing may be provided by first class mail to the last known address of the parent. (§ 294, subd. (d).) However, father claims that such notice was not reasonably calculated to provide him adequate notice. Father argues that DCFS was required to give him notice of the continued section 366.26 hearing date within a

32

reasonable time period prior to the continued hearing date. (Citing *In re Phillip F.* (2000) 78 Cal.App.4th 250, 258 [notice inadequate when mailed to mother's former address after she had notified the court of her new address]; *In re Julian L.* (1998) 67 Cal.App.4th 204, 208 [mother's waiver of her appearance for a permanency planning hearing did not apply to the continued hearing].)  Father points out that the United States Postal Service Web site indicates that first class mail is delivered within one to five business days.[9]  Father argues that notice via first class mail a mere five days before the hearing, two of which fell on a weekend, was not a reasonable period of time prior to the hearing date, thus violating father's right to procedural due process of law.  (U.S. Const., 14th Amend.)

Father fails to provide evidence of the date he received the mailed notice.  As the cited website indicates, the notice could have arrived anywhere between one to five days.  Under the circumstances, absent indication from father that notice was not, in fact, received in a timely manner, we decline to find the first class mail service inadequate.

Father argues that the juvenile court erred in declining father's counsel's request to continue the section 366.26 hearing because DCFS did not provide father with adequate notice of the continued hearing.  First, father has not shown that notice was inadequate under the circumstances of this case.  Further, father has failed to show that a continuance was proper under the circumstances.

---

[9]    In support of this fact, father cites the Web site <https://www.usps.com/ship/first-class-mail.htm> [as of May 17, 2023], archived at <https://perma.cc/5J8X-6U5M>.

33

A juvenile court may only grant a continuance if it is not contrary to the best interests of the child. (§ 352, subd. (a)(1); Cal. Rules of Court, rule 5.550(a)(1).) In addition, a juvenile court may only grant a continuance for good cause shown and for a period proven necessary. (§ 352, subd. (a)(2); Cal. Rules of court, rule 5.550, subd. (a)(2).) "In considering a request for a continuance, the court must 'give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.'" (*In re J.I.* (2003) 108 Cal.App.4th 903, 912, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) A juvenile court's denial of a request for continuance is reviewed for abuse of discretion. (*In re Karla C.* (2003) 113 Cal.App.4th 166, 180.)

As set forth above, father failed to show that notice was unreasonable. In addition, he fails to show that there was good cause for a continuance or that such a continuance was in D.L.'s best interest. Father's attorney conceded at the hearing that there did not appear to be a basis for contesting DCFS's recommendation to terminate parental rights. No error occurred.

## V. ICWA investigation

Finally, father argues that the ICWA inquiry in this matter was insufficient. Due to the trial court's failure to determine whether father was a presumed or biological father, an initial inquiry of father's family members was not triggered. (*In re E.G.* (2009) 170 Cal.App.4th 1530, 1532-1533 ["Until biological paternity is established, an alleged father's claims of Indian heritage do not trigger any ICWA notice requirement . . . ."].) Father argues that the matter must be reversed for a

determination of father's biological status and, if the court finds father to be D.L.'s biological father, it should direct DCFS to conduct an initial ICWA inquiry of D.L.'s known and extended family members as required by section 224.2, subdivision (b). (*In re Baby Boy V., supra*, 140 Cal.App.4th at p. 1119.)

DCFS concedes that the record reflects that not all maternal extended family members were asked if D.L. was or could be an Indian child and that the matter should be remanded for further inquiry for that reason. DCFS also suggests that, if on remand the juvenile court finds father to be D.L.'s biological father, the further initial inquiry should include available paternal extended family members.

**A.    *Applicable law***

ICWA and related California statutes reflect the Legislature's intent "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families." (25 U.S.C. § 1902; see *In re K.R.* (2018) 20 Cal.App.5th 701, 706, fn. 3.) An "Indian child" is defined as any unmarried person under the age of 18 who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subds. (a), (b).)

"Because it typically is not self-evident whether a child is an Indian child, both federal and state law mandate certain inquiries to be made in each case. These requirements are sometimes collectively referred to as the duty of initial inquiry." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741 (*Benjamin M.*).) "The duty to inquire begins with the initial

35

contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) The court and child welfare department "have an affirmative and continuing duty" to inquire whether a child for whom a petition under section 300 may be or has been filed may be an Indian child. (*Ibid.*)

Under California law, the child welfare department's initial duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b).) Under ICWA, the term "extended family member" is "defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2).)

The juvenile court must also inquire at each participant's first appearance in court whether the participant knows or has reason to know that the child is an Indian child. (§ 224.2, subd. (c).) In addition, the juvenile court must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child. (*Ibid.*)

If the "initial inquiry creates a 'reason to *believe'* the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' ([§ 224.2], subd. (e), italics

36

added.) [I]f that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

### B. *Conditional reversal and remand*

The parties agree that DCFS and the juvenile court violated ICWA and California's equivalent law by not asking certain relatives about the child's potential status as an Indian child. The parties also agree that the juvenile court failed to determine father's status as a biological parent. Because we have determined that the error in determining father's status is prejudicial only as to the ICWA issue, we address the two together.

The California Supreme Court is currently reviewing several opinions of the Court of Appeal addressing how prejudice should be addressed where, as here, there is ICWA initial inquiry error. Under the test we use for assessing prejudice, which is set forth in *In re Dezi C.* (2022) 79 Cal.App.5th 769, 774, review granted, Sept. 21, 2022, S275578 (*Dezi C.*), the parents have not carried their burden of showing that "the record contains information suggesting a reason to believe that the child[] at issue may be [an] 'Indian child.'" Were there no agreement as to ICWA error and request for a remand, we would apply *Dezi C.* and affirm the order terminating parental rights.

37

In our view, however, the parties' agreement and request alters the calculus. We are not required to accept the parties' agreement on this issue. (E.g., *People v. Alvarado* (1982) 133 Cal.App.3d 1003, 1021.) Instead, we must ask: Is it *appropriate* to accede to the parties' request for a remand?

We conclude that the answer is "yes." Although DCFS requests a conditional *affirmance*, we believe that what they seek, functionally, is a conditional *reversal* for the limited purpose of determining father's status and allowing DCFS to satisfy its duty of initial inquiry under ICWA and thereby to eliminate the ICWA "error" that the parties (and we) believe exists. We recognize that the Courts of Appeal are deeply split on whether to conditionally affirm or conditionally reverse in cases where there is no stipulation (compare, e.g., *In re J.K.* (2022) 83 Cal.App.5th 498 [conditionally affirming] and *In re Rylei S.* (2022) 81 Cal.App.5th 309 [same] with, e.g., *In re D.B.* (2022) 87 Cal.App.5th 239 [conditionally reversing] and *In re E.V.* (2022) 80 Cal.App.5th 691 [same]), but conclude that the functional effect of what we are doing should control in cases where the parties are agreeing to a limited remand following an order terminating parental rights. (*In re A.C.* (2022) 86 Cal.App.5th 130 [accepting stipulation, but issuing disposition as conditional reversal]; *In re Veronica G.* (2007) 157 Cal.App.4th 179, 187.)

Our Legislature has defined for us when it is appropriate for an appellate court to accede to the parties' request to "reverse or vacate a duly entered judgment upon an agreement or stipulation of the parties"; specifically, we may do so only if we find (1) "[t]here is no reasonable possibility that the interests of nonparties or the public will be adversely affected by the reversal," and (2) "[t]he reasons of the parties for requesting

38

reversal outweigh the erosion of public trust that may result from the nullification of a judgment and the risk that the availability of stipulated reversal will reduce the incentive for pretrial settlement." (Code Civ. Proc., § 128, subd. (a)(8).)

Under these standards, conditional reversal with a limited remand to determine father's status and comply with ICWA is appropriate in this case. The reasons for the remand request is a practical one: It is not clear at this time what the test is for assessing "prejudice" in cases where DCFS has not complied with its ICWA duty of initial inquiry; the error in this case would be prejudicial under some tests and not prejudicial under others; the California Supreme Court is not likely to resolve this issue for months, if not years; there is the possibility that a ruling by this court affirming the termination of parental rights (due to absence of "prejudice" from the ICWA error under the *Dezi C.* test) might be undone months, if not years, from now when the Supreme Court defines the proper test for "prejudice"; it is undisputed that, in dependency proceedings "involv[ing] the well-being of children," "considerations such as permanency and stability are of paramount importance" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute as stated in *In re M.R.* (2005) 132 Cal.App.4th 269, 273); and these considerations of permanency and stability are better served by a remand to eliminate any ICWA error *now* (and thereby to ensure that the order terminating parental rights can be final sooner rather than later) rather than rejecting remand and affirming (which leaves open the possibility that the ICWA issue—and, depending on the outcome of that issue, the entire case—will be re-opened months, if not years, down the line). Given these considerations, there is "no reasonable possibility" that the interests of the nonparties

(namely, the prospective adoptive parents and the Indian tribes) "will be adversely affected by the reversal" because those nonparties will benefit by the stability imparted by resolving the ICWA issue now instead of at some point in the future. And the permanency and stability imparted by a remand to resolve the ICWA issue now also "outweigh[s] the erosion of public trust" that arises from conditionally reversing the order terminating parental rights. Indeed, the remand in this case *enhances* the public trust by ensuring compliance with ICWA. We therefore conditionally reverse the April 18, 2022 order terminating parental rights, with specific directions to the trial court as set forth below.

## VI.  Mother's appeal

Mother makes no independent claim of error regarding the order terminating her parental rights. However, she argues that should this court reverse the order terminating father's parental rights, it should also reverse the order terminating her parental rights. (Cal. Rules of Court, rule 5.725(f); *In re Vincent S.* (2001) 92 Cal.App.4th 1090, 1093; *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 102.) DCFS does not oppose mother's request.

## DISPOSITION

It is ordered that the juvenile court's April 18, 2022 order terminating parental rights is hereby conditionally reversed. The matter is remanded to the juvenile court with the following directions:

1. The court shall determine father's parental status;

2. DCFS shall make efforts to interview all available extended family members regarding whether D.L. is or may be an Indian child; including the extended family members on father's

40

side if father is elevated to a status that qualifies for such inquiry;

3.  At a noticed hearing, with counsel for the parties reappointed, the juvenile court shall make a finding regarding ICWA's applicability, determine whether DCFS has interviewed all available extended family members, and proceed according to sections 224.2 and 224.3, including, if required, ordering DCFS to send notices with the above information to any appropriate tribes in accordance with ICWA;

4.  If based on the responses from the extended family members the court finds there is no reason to believe D.L. is an Indian child, or if no tribe or agency determines D.L. is an Indian child after notice has been provided pursuant to ICWA, the order terminating parental rights shall remain the order of the court. If notices are sent and after the juvenile court receives responses from the noticed tribes, it shall proceed in accordance with ICWA if any tribe determines D.L. is an Indian child.

_____
CHAVEZ, J.

I concur:


_____
HOFFSTADT, J.

41

*In re D.L.*, B319995
ASHMANN-GERST, Acting P. J., Concurring in the Judgment.

I agree with the majority that this matter must be conditionally reversed and remanded for compliance with the Indian Child Welfare Act (ICWA), but I write separately to clarify the basis for my opinion. As the majority notes, the juvenile court's failure to determine Devon L.'s (father) parentage status was prejudicial "to the extent that it denied D.L. access to her . . . potential history of Indian heritage." (Maj. Opn., at p. 29; see also *id*. at p. 37 ["we have determined that the error in determining father's status is prejudicial . . . as to the ICWA issue"].) Despite finding the juvenile court's order prejudicial, the majority does not seem to reverse on that ground. Rather, they find the parties' agreement to be determinative. (Maj. Opn., at p. 37 ["Were there no agreement as to ICWA error and request for a remand, we would apply [*In re Dezi C.* (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578] and affirm the order terminating parental rights"].)

I agree with my colleagues to the extent they conclude that the juvenile court's failure to determine father's parentage status constitutes prejudicial ICWA error, under any standard of prejudice.[1] In my opinion, that finding alone compels reversal.

---

[1]  Numerous appellate courts have weighed in on the consequence, in an appeal from an order terminating parental rights, of a social services agency's failure to conduct the required initial ICWA inquiry. This has resulted in "a continuum of tests for prejudice stemming from error in following California statutes implementing ICWA." (*In re A.C.* (2022) 75 Cal.App.5th 1009, 1011; see also *In re Dezi C., supra*, 79 Cal.App.5th at pp. 777–778.)

(Cal. Const., art. VI, § 13; *In re J.R.* (2022) 82 Cal.App.5th 526, 531.)  There is no reason to resort to the parties' agreement that the matter be conditionally reversed and remanded.


_____, Acting P. J.
ASHMANN-GERST

2